GEORGE W. SHEFFIELD, TAX COLLECTOR, AND THE STATE OF TEXAS, INTERVENER, V. W. C. HOGG ET AL.

No. 6001.

Error to the Court of Civil Appeals for the First District, in an appeal from Brazoria County.

THE FEDERAL ROYALTY COMPANY V. STATE OF TEXAS.

No. 6130.

Error to the Court of Civil Appeals for the Eighth District, in an appeal from Pecos County.

Decided December 31, 1934.
Rehearing overruled February 27, 1935.
(77 S. W., 2d Series, 1021.)
(80 S. W., 2d Series, 741.)

*Rucks & Enlow, Carlos B. Masterson,* and *Floyd Enlow,* all of Angleton, *James V. Allred,* Attorney General, *Scott Gaines,* Assistant Attorney General, *G. P. Dougherty, R. E. Seagler, F. T. Baldwin, Boyles, Brown & Scott, John Broughton* and *Walter C.ʼ Clemons,* all of Houston, for plaintiff in error Geo. W. Sheffield and the State of Texas.

*Ike S. Handy,* of Houston, for plaintiff in error Federal Royalty Company.

A mineral lease, by the terms of which the lessee, his successors, vendees and assigns, are obligated to deliver to the lessors, their vendees and assigns, an equal one-eighth part of the oil produced—the lessee having no right of purchase, disposition, appropriation of or control over the part of the oil required to be delivered to the lessors, and any disposition thereof other than delivery to lessors being precluded—conveys to the lessee a determinable fee in seven-eighths of such oil and reserves to the lessors the title to one-eighth of such oil, which one-eighth interest is an estate in land, subject to taxation as such against lessors in the county in which the land described in the lease is situated. Ehlinger v. Clark, 117 Texas, 547, 8 S. W. (2d) 666; Magnolia Petroleum Co. v. Connellee, 11 S. W. (2d) 158 (Com. App.); Mon-Tex Corporation v. Peteet, 118 Texas, 546, 19 S. W. (2d) 32; Texas Co. v. Davis, 113 Texas, 321, 254 S. W., 304; Theisen v. Robison, 117 Texas, 489, 8 S. W. (2d) 646; Waggoner Estate v. Sigler Oil Co., 118 Texas, 509, 19 S. W. (2d) 27; Mills & Willingham on Law of Oil & Gas, 179.

Valuations for the purpose of taxation were not discriminatory, but properly fixed. Davis v. Sears, 35 S. W. (2d) 99 (Com. App.); Cobb v. Downing, 1 S. W. (2d) 508 (error denied); Lively v. Missouri, K. & T. Ry. Co., 102 Texas, 545, 120 S. W., 852; Victory v. Hinson, 71 S. W. (2d) 365.

*Stephen L. Pinckney, David M. Picton, Jr.,* both of Houston, for defendant in error Hogg et al., *Howell Johnson,* County Attorney of Pecos County, and *Hart Johnson,* both of Fort Stockton, *Brian Montague,* of Del Rio, *James V. Allred,* Attorney General, and *F. O. McKinsey,* Assistant Attorney General, for defendant in error State.

Royalty on oil and gas to be produced under the terms of an oil and gas lease in full force and effect is personal property and

not subject to tax as real estate in the county where land is situated. Leonard v. Prater, 36 S. W. (2d) 216; Ryan v. Kent, 36 S. W. (2d) 1107; Colquitt v. Gulf Production Co., 52 S. W. (2d) 235.

*Walton D. Taylor*, of Houston, *Henry P. Burney, Leroy G. Denman* and *Gilbert M. Denman*, all of San Antonio, *Curtis E. Hill*, County Attorney of Upshur County, *Gus Morris* and *Milton Greer Mell*, all of Gilmer, *E. S. Pritchard*, of Fort Worth, and *W. G. Banks*, of Longview, filed briefs as amicus curiae.

MR. JUSTICE GREENWOOD delivered the opinion of the court.

The above styled two cases will be determined under one opinion. In their consequences, the cases affect directly the subject matter of mineral royalties in Texas, which furnish an important basis for the State's oil industry. Involving the correct solution of taxation of royalties on minerals—liquid, solid, and gaseous—they require the determination of the rights acquired by lessors and lessees under conveyances and contracts under which much of our minerals of untold value are owned and held. The questions presented by the two cases are logically too closely related for much that is said in one case not to apply to what is said in the other.

For convenience, in this opinion cause No. 6001 will be called the "Hogg case," and cause No. 6130 will be called the "Federal Royalty Company Case."

The questions for decision in the "Hogg Case," save some relating to the manner and validity of the assessment of the properties, may be sufficiently discussed under the concise statement of the nature and result of the suit and the statement of the undisputed facts, contained in that part of the opinion of the Court of Civil Appeals, which is copied as follows:

"This suit was brought by appellants against the tax collector of Brazoria county, the county of Brazoria, two independent school districts, and a navigation district in said county, the commissioners' court, and all the officials of said county and districts having to do with the assessment of properery for taxation and the collection of taxes in said county, to enjoin the collection of taxes levied and assessed upon one-eighth of the oil and other minerals in lands owned by appellants in said county for the year 1927.

"Five private oil corporations engaged in the production of oil on the lands of appellants in the county were also made defendants.

"Before the trial in the court below the state of Texas intervened in the suit and sought recovery against appellants for alleged delinquent taxes due for the year 1927, with interest, penalties, and costs.

\*    \*    \*    \*    \*    \*

"Plaintiffs are, and were on January 1, 1927, the owners of the lands in Brazoria county described in their petition, in and under which the oil and other minerals assessed for taxes by the tax assessor of the county for that year as plaintiffs' and defendant oil companies' property was situated.  On June 6, 1913, plaintiffs being then the owners of these lands, executed to John Hamman the contract of sale and lease referred to in plaintiffs' petition.  This instrument, which is denominated a 'Mineral Lease Contract,' in its first contractual paragraph declares:  'That, for and in consideration of the sum of One Dollas ($1.00) cash in hand to first parties paid by second party, the receipt whereof is acknowledged, and of the covenants and agreements herein embraced and hereby undertaken by second party, first parties do transfer and set over, sell and convey (under the terms and conditions hereof, and for the period and purpose herein set forth) all the gas, oil, sulphur and other minerals and mineral substances whatsoever on, in and under the hereinafter described land, and the exclusive right and privilege to go on and upon said land, and to take possession thereof, for the purpose of drilling for and prospecting therefor, and, after the finding thereof, the development and production of same, and to that end, shall have the right to do and perform all proper and desired acts and things in the premises, especially the right to use all necessary water thereon or therein, and to erect any and all works and buildings, construct derricks, place machinery, and construct and place all manner of tanks and pipe lines desired."

The Court of Civil Appeals here refers to paragraph fifth of the contract of sale and lease, which reads as follows:

"Fifth:  (a)  In consideration of this lease second party agrees that first parties shall have the following royalty of the gross production of all oil or gas wells on said lands, to-wit: one-eighth of all oil and one-eighth of all gas; and first parties' one-eighth royalty interest in all oil and gas marketed from said land to be paid over to them by second party at the end of each month, or whenever second party shall receive pay therefor, such royalty to be delivered by second party to the credit of first parties in any pipe-line or pipe-lines which said first parties may designate, and which connect with the wells or connect

with the settling tanks of second party, free of any charge to first parties, or into said first parties' own private storage upon said land, or upon their other land adjoining, at the expense of said first parties; and first parties shall have one-eighth interest in all money realized from gas marketed from said land, as a royalty to be paid over to them, or their order, at the end of each month, or whenever second party shall receive pay therefor.

"(b) If sulphur or other minerals are produced on said land, second party shall pay first party $1.00 per ton of 2240 pounds for each ton thereof produced and saved from said land; quarterly settlements to be made by second party with first parties by either the payment to them in person of proper amount or by its deposit to their credit in their bank, or its successor in business."

After referring to paragraph fifth, the Court proceeds with its statement of undisputed facts, as follows:

"Plaintiffs, none of whom are residents of Brazoria County, rendered for taxes for the year 1927 all of their property in the county of Brazoria, both real and personal. This rendition of their property did not list or include any part of the unproduced oil or other minerals underlying the lands described in their petition, but contained the following notation by them: 'Note: It is not the intention to render any of the oil, gas, sulphur or other minerals in the above lands, as said minerals were transferred, set over, sold and conveyed by Will C. Hogg, Miss Ima Hogg, Mike Hogg, and Tom Hogg to John Hamman per instrument dated June 6, 1913, recorded in Book 125, pages 53 et seq., of the Deed Records of Brazoria County, which instrument covers all of said land.'

"This rendition was accepted and approved by the tax assessor and commissioners' court of the county, and all taxes levied on the property therein rendered were paid by plaintiffs in December, 1927. The tax assessor, however, placed upon the unrendered roll and assessed for taxes for that year against plaintiffs and the defendant oil companies, jointly, one-eighth of the oil and minerals underlying these lands. None of the taxes accruing upon this rendition and assessment were paid by plaintiffs or the defendant oil companies. These are the taxes the collection of which from them plaintiffs ask to be enjoined, and for which, with interest, penalties, and costs, the intervener, the state of Texas, sought and recovered judgment against plaintiffs in the court below.

"The defendant oil companies, each of whom held under transfer and conveyance from John Hamman separate por-

tions of the oil and other minerals conveyed to him by plaintiffs by the instrument before set out, rendered for taxes and paid the taxes for the year 1927 on seven-eighths of the oil and minerals in and under the several tracts of land described in the respective conveyances to them from Hamman."

The main question to be decided in the "Hogg Case" is the correctness of the proposition in the Argument for defendants in error W. C. Hogg and others, viz.:

"The rule of construction applicable to the Hogg-Hamman instrument should be this: Because of the fact that the parties thereto did use apt words of conveyance of all the minerals in place, and because there is no ambiguity in such language in the instrument, and because there is no language in the instrument that can fairly be construed, either as an exception of any of the minerals expressly conveyed, or as a reservation of title by defendants in error of any such minerals, therefore no other fair construction of such instrument can be made than that the parties thereto meant what they clearly stated in the granting clause of the instrument, wherein Miss Ima Hogg et al. 'do transfer and set over, sell and convey * * * *all* of the gas, oil, sulphur and other minerals and mineral substances whatsoever on, in and under the hereinafter described land, and the exclusive right and privilege to go on and upon said land. and to take possession thereof for the purpose of drilling for and prospecting therefor, and, after the finding thereof, the development and production of same.' "

In the "Federal Royalty Company Case," the brief and argument for Plaintiff in Error in the Supreme Court states the controlling facts as follows:

"There are three leases involved in the instant case. One covering Section 60, Block 1, I. & G. N. Railway Co., a patented railroad survey; another covering Section 101, Block 194, G. C. & S. F. Railway Co., a patented railroad survey; and the third covering Section 32, Block 194, G. C. & S. F. Railway Co., an unpatented State school survey.

"The leases, in so far as general form and provisions are concerned, are identical. Each lease contains the same granting clause, to-wit: 'Have granted, demised, leased and let and by these presents does grant, lease and let unto the said lessee for the sole and only purpose of mining and operating for oil and gas, and of laying pipe lines and of building tanks, power stations and structures thereon to produce, save and care for said production, all that certain tract of land,' etc.

"The royalty provision is as follows: 'In consideration of the premises the said lessee covenants and agrees: To deliver

to the credit of the lessor free of cost, in the pipe line to which he may connect his wells the equal one-eighth part of all oil produced and saved from the leased premises.'

"The lease covering Section 32 differs from the other two leases in that it is executed by the lessor individually and as agent for the State of Texas and recites that it is made by virtue of authority granted by Articles 1 and 2, Chapter 81 of the Acts of the 36th Legislature, second called session, and Article 1, Chapter 38 of the Acts of the 37th Legislature, first called session.

"The lease covering Section 60 contains the additional provision: 'It is expressly agreed that and understood that grantors by a prior conveyance conveyed to Lee Hager of Harris County, Texas, a one-sixteenth royalty interest in all oil and gas in and under said land, but reserving the rights for grantors to lease said lands, and all future rentals to be paid to grantors under the terms of said royalty deed. But it is understood that one-half of the one-eighth royalty provided for shall be paid to the said Lee Hager, his heirs or assigns.

" 'In other words, the one-eighth royalty herein provided shall be divided equally between the said Lee Hager and the said Ira G. Yates and words "lessors" as used herein, relative to the one-eighth royalty, shall refer to both said Yates and said Hager.' "

The brief and argument states, at page 14:

"The real question in this case is whether a royalty interest under an ordinary oil and gas lease, is a taxable interest in real estate. And by the expression 'ordinary oil and gas lease' is meant any one of the several forms of contract which gives to the lessee the exclusive dominion and control over the *oil and gas in place in the ground* and provides for the delivery of a fractional part of the oil, after it is produced, to the lessor."

At the outset, it must be regarded as finally settled in this State, as stated in Waggoner's Estate v. Sigler, 118 Texas, 517, 19 S. W. (2d) 27, that the ordinary oil lease operates to invest the lessee with a determinable fee in oil and gas in place. The question before us, accepting that postulate, is what was the interest of the lessors under the instruments through which they claim in each of the cases now before us? Despite differences in their phraseology and forms, we have concluded, after careful consultation and deliberation, that the lessor's interest, sought to be taxed in each instance in these cases, or that of his assign, was an interest in land, subject to taxation as such in the counties in which the respective tracts of land are situated.

Let us consider the contracts in the order we have referred to them. The fifth clause of the Hogg-Hamman contract states that as consideration therefor the lessors *"shall have"* a certain royalty, being ⅛ of the oil produced and ⅛ of the gas produced on the lands, the oil to be delivered in any pipe-lines the lessors may designate, connected with the wells or into the lessor's private storage upon the leased land or any adjoining land; while for the gas the lessors *"shall have"* *one-eighth interest* in all money realized from gas marketed from said land, and for the sulphur or other minerals $1.00 for each ton produced and saved from the land, under quarterly cash settlements.

■■ Endeavoring to reach the true purpose and intent of parties we can draw no substantial difference, so far as taxation is concerned, between an agreement *excepting* from a grant or a lease a certain fractional portion of minerals, or an agreement *reserving* the same portion, or an agreement that the lessor *"shall have"* or *rather shall continue to have* the same portion, or an agreement that the lessees *shall yield or shall deliver to the lessor* exactly the same portion. In either instance, the title to the specified mineral portion is intended to remain or vest, and does actually remain or vest in the lessor. It logically can make no difference, as may have been intimated in this justice's and in other far greater jurists' reasoning, whether the oil is retained by the lessor as oil and gas, readily convertible into cash on the market, or whether the lessee is given a power to sell *all* of the oil and gas, always accounting for a fixed royalty portion to the lessor. Sound principle, supported by the highest authority, goes further and compels us to accede to the proposition that dealing with oil and gas or dealing with solids in place, like sulphur, lignite, salt, coal, or lime, the lessor owning the entire fee simple title to the land, and his assigns, who have been careful to secure to themselves, their heirs or assigns, (by exception or reservation or by contract for "having" or yielding or paying, or for delivery, or by what-not similar contractual clause), the right to a portion of the proceeds or profits derived from the lessee's or his assigns' authorized sale of the minerals, throughout the duration of a determinable fee, which may be perpetual, have and own a fee simple interest in land, or at least have a right belonging or appertaining to the horizontal strata of the land in which the minerals are embedded. Humphreys-Mexia Co. v. Gammon, 113 Texas, 247, 254 S. W., 296; Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Texas, 458, 6 S. W. (2d) 1039. We therefore hold that all the property interests of ascertainable value, secured to the

lessors or their assigns under the Hogg-Hamman lease, are subject to taxation as real estate in the county wherein the land lies, as adjudged by the District Court.

The oil industry in Texas is largely dependent for development, growth, or prosperity, on the doctrine that the interests we are considering—such as the lessee's and the lessor's estates under contracts which are in customary use in Texas—are interests in land; and hence not subject to parol sale, but have the protection of the statute of frauds, the statutes regulating conveyances and mortgages of real estate, and the statutes requiring the record of instruments affecting title to or liens on land, so that purchasers can rely on deed and lien records and can execute and receive transfers and conveyances in reliance on true abstracts or title and lawyers' correct opinions thereon. Were the stability furnished by these rules withdrawn and the fundamental contracts, on which the oil business so largely rests, be adjudged by the Supreme Court to create mere rights in personalty at some uncertain date in the future, the structure of the business would be seriously, if not fatally, jeopardized.

At least in so far as we are dealing with leases under which the lessors are entitled "to have," or to require "the delivery of," a fraction of the oil itself, (as does each lease involved in these two cases), our conclusion is the same as was reached in Hager v. Stakes, Tax Collector, 116 Texas, 453 to 472, 294 S. W., 835. One paragraph of that opinion reads:

"Assuming, as does the certificate of the Honorable Court of Civil Appeals, that the lessor in each of these leases owned each tract of land leased, or an undivided interest therein, at the time each lease was executed, and bearing in mind that the minerals or any portion thereof could be severed and separately owned, and that the minerals or a fraction of same could be conveyed, in place, only as part of the realty, there is no escape from the conclusion that the portion of the oil and other minerals not conveyed but required to be delivered to the lessor *continued* to belong to the lessor, *and continued to be realty.*"

Another paragraph of the opinion, considering questions arising where the lease was made *"subject to* the royalties hereinafter *reserved,"* reads:

"We think a dominant purpose of the parties was to make impossible any other disposition of 1/8th of 17/18ths of this petroleum than its delivery to the lessor, or his assigns, as the property of the lessor or his assigns. Hence, no matter how poorly expressed, there being words disclosing such purpose, there is excepted from the grant the one-eighth part of the

seventeen-eighteenths of the petroleum. It is obvious that the instrument negatives the view that the obligation to deliver a portion of the oil was intended to be a mere personal covenant of the lessee or its assigns. Likewise, the obligation was not meant to enure to the personal benefit of the lessor. *It was meant to benefit the owner of an estate in the land and to permanently run with the land."* (Italics ours).

At page 470 of the opinion in Hager v. Stakes, Tax Collector, supra, we expressly approved a former opinion of the Court which is decisive as to the nature of the title to a fraction of oil which the lessor under such a lease as that under consideration may require the lesese to deliver. For we said:

"The court in an opinion of Chief Justice Phillips stated the legal effect of a lease to be to invest the grantee with 'the right to seven-eighth of the oil if found.' That least contained language less clear than that now before us to *except* from the grant or to *reserve* to the lessor one-eighth of the minerals. For that lease 'recited that the grantors, in consideration of $28.20 paid by the grantee, the receipt being acknowledged, had granted, sold, etc., unto the grantee *all* the oil, gas, coal and other minerals in and under the land described, with the *exclusive* right to drill, mine and operate thereon for producing oil, gas, coal and other minerals; to be held by the grantee for the term of ten years from the date of the instrument and as much longer as oil, gas or other minerals were produced in paying quantities; *yielding* to the grantors the 1/8th part of all oil produced and saved from the premises.' Corsicana Petroleum Company v. Owens, 110 Texas, 570, 571, 222 S. W., 154, 155."

Nevertheless we are cognizant that language was used in Hager v. Stakes, supra, and in Ehlinger v. Clark, 117 Texas, 557, 558, 8 S. W. (2d) 666, which is or may seem repugnant to some holdings we now make. Some of this language was doubtless unnecessary to reach the adjudications made. Our attention has also been called by counsel to frequent other declarations by Texas appellate judges, which cannot be reconciled with our present holdings. We cannot discuss them in detail, and no very good result would follow therefrom. Most such declarations appear to have been occasioned by earnest attempts to follow something appearing in a Supreme Court or Commission opinion, which at times was dicta. It is enough to say that declarations contrary to what is necessarily decided in this opinion are disapproved.

Japhet v. McRae, 276 S. W., 669, 670, held that the lessor, after making a lease of oil, reserving a royalty of one-eighth,

conveyed such royalty by his deed *to the land*. No such pronouncement could have been made had the royalty been regarded as personalty or a chose in action. It passed by deed to the land only because it was land or some interest belonging or appertaining thereto. The opinion of Presiding Judge Powell in that case was not only expressly approved, but he states in its context that the opinion followed full and free consultation with the justices of the Supreme Court. The opinion further states that it is supported by the "great weight of authority" after its author had "reviewed all the authorities most carefully." After such review, the opinion, expressly sanctioned by the Court, says:

"Japhet unquestionably bought the *realty* in the 10 acres. He bought one-eighth of the oil in and under the land. * * * If the lessee had made any effort to take it away from him, Japhet would have been entitled to sue him as for the conversion of his property." 276 S. W., 671.

Commenting on the rule laid down in Japhet v. McRae, supra, Mr. H. W. Walker, Jr., of the faculty of the University of Texas, says:

"The only way to justify the passage of unaccrued royalties by the sale of the surface estate when they are unmentioned in the conveyance is because they are interests in land, and this is true whether they are regarded as passing because incidental to the surface estate or, as the writer contends, because included within the description in the deed (admitting the description to be sufficient for this purpose). But if they are interests in land the assignment thereof comes within the provision of the statutes requiring conveyances of interests in land to be recorded in order to be valid as to subsequent bona fide purchases and creditors. All of the foregoing problems and complications and the resulting confusion of land titles can be avoided by a holding that all royalties and delay rentals, regardless of the method of payment, are interests in land within the meaning of the registration statutes. Vol. VII, No. 1, Texas Law Review, Dec., 1928, p. 49.

The Japhet case is followed in Bibb v. Nolan, 6 S. W. (2d) 157, W. of E. ref.; Humble Oil & Ref. Co. v. Davis (Tex. Com. App.), 296 S. W., 287.

Reynolds v. McMan Oil & Gas Company, 11 S. W. (2d) 780, was decided under an opinion of the Commission by Judge Speer, approved by the Supreme Court at page 787, wherein it is said that the cases of Waggoner v. Wichita County, 273 U. S., 113, 47 S. Ct., 271, 71 L. Ed., 566, and Hager v. Stakes, supra, do affirmatively decide that the extent of the estate granted

in such instruments as were before the courts in those cases is the oil and gas, *less* the exception contained in the royalty clause, *which exception is real estate and remains* the property of the lessor.

In the late case of Jackson v. United Producers' Pipe Line Company, 33 S. W. (2d) 541, the Court, per Mr. Justice Dunklin, said:

"On April 16, 1917, J. W. Langford and wife, Letha Langford, executed to J. W. Lynch an oil and gas lease on 125 acres of land in Eastland County. In that lease a royalty interest of one-eighth of the oil to be produced was reserved by the grantors. The interest so reserved by the lessors was an interest in realty, and the same is true of the leasehold interest conveyed to Lynch, as is well settled by the decisions of the Supreme Court of this state, as shown in Hager v. Stakes, Tax Collector, 116 Texas, 453, 294 S. W., 835, and numerous decisions there cited. The legal effect of that conveyance was to vest in Lynch and his assignees seven-eighths of the oil to be produced from the land and to *reserve* to the lessor one-eighth of the oil."

To like effect, see Taylor v. Higgins Oil & Fuel Co., 2 S. W. (2d) 288.

Our decision is in accord with opinions, carefully prepared, of the U. S. Supreme Court, and of the Circuit Court of Appeals for the district including Texas, and with late opinions of the U. S. Judges in Texas Districts, such as the valuable opinion of Judge Atwell, 298 Fed., 821.

Waggoner's Estate v. Wichita County, 273 U. S., 113, is the last case from the Supreme Court of the United States in point, to which we have been directed. Attorneys on each side argue it supports their respective contentions. The leases before the Court obligated the lessees *"to deliver to the lessor,* free of charge, in the pipe line to which said lease may be connected, *the equal one-eighth part of all the oil and gas produced on said premises,* settlement to be made not later than the tenth day of each month for the preceding month." The leases also contained an express covenant for the lessee to pay seven-eighths of all increase in taxes assessed against the land. Construing such leases, the Court gave its own independent conclusion, speaking through Mr. Justice Stone, as if there were no controlling authority in the Texas decisions, that "we find in the terms of the leases themselves no basis for the contention that the lessor granted or conveyed away his entire interest in the oil." The opinion closes with the significant words: "See,

also, United States v. Noble, 237 U. S., 74, 80; Barnsdall v. Bradford Gas Co., 225 Pa. St., 338, 343."

Following the reference in Justice Stone's opinion to Barnsdall v. Bradford Gas Co., supra, we find the opinion of the Supreme Court of Pennsylvania states the contract before the court and determines its legal effect in these words:

"The lease was to remain in force for a term of ten years, and as much longer as the premises were operated for oil or gas or as the rent for failure to commence operations was paid. The consideration was the delivery in pipe lines to the credit of the first party the equal one-eighth part of all the oil produced and saved from the premises. * * * By the agreement the *exclusive* right to take and appropriate *all* the minerals is conveyed, and during the term of the lease the lessor has no right to enter and operate for oil or gas. The *title* to the oil *except the one-eighth thereof* is vested in the lessee, as is also the title to the gas and other minerals, in the land. Under the rule of construction established, not only in other jurisdictions, but by our own cases, therefore, the agreement creates a *corporeal* interest in the lessee in the demised premises, and is not merely a license to enter and operate for oil and gas." (Italics ours).

Following the first reference at the close of Justice Stone's opinion to the case of U. S. v. Noble, 237 U. S., 74, 59 L. Ed., pp. 846-849, we find an opinion by Mr. Justice Hughes, which removes all doubt of the correctness of our every holding in the cases now under consideration.

We quote only such portion of the statement of the controlling facts by Mr. Justice Hughes as will make plain the Court's precise, unanimous conclusion, when wholly unhampered by state authorities. Such portion follows:

"The act of 1895 contained the following restriction: 'Provided that said allotments shall be inalienable for a period of twenty-five years from and after the date of said patents.'

"Lease dated January 11, 1902 (from an Indian allottee to A. W. Abrams, for ten years from date, in consideration of the sum of $10, and a royalty of five per cent. of the market value of all minerals mined or removed (except gas, for which there was to be paid $40 per annum for each paying well), with the proviso that there should be a minimum rental of $20 a year in case the royalties did not exceed that amount. On August 13, 1903, the lease was assigned by Abrams to the Iowa & Oklahoma Mining Company.

\* \* \* \* \* \*

"Grant or assignment, dated August 16, 1902, to the ap-

**304**

pellee, Charles F. Noble, of all the allottee's 'right, title and interest in and to the royalty, rent and proceeds' of the mining lease dated January 11, 1902, made to Abrams, described in paragraph (1). It was further agreed, by said instrument, that if the Abrams lease 'should be surrendered and become void the within lease should hold good for the period of ten years.' On the same date, Noble assigned 'a one-half interest in the above-described instrument' to John M. Cooper."

. The parts of the opinion determining the nature of the interest retained under the above lease, in the language of the Supreme Court of the United States follows:

"In the act of ratification of 1895 Congress imposed the restriction upon alienation which has been quoted. The guardianship of the United States continues, notwithstanding the citizenship conferred upon the allottees; * * * and where Congress has imposed restrictions upon the alienation of an allottment, the United States has capacity to sue for the purpose of setting aside conveyances or contracts by which these restrictions have been transgressed. (Authorities omitted).

"We may first consider *the asignments of rents and royalties.* Under his patent, the allottee took an estate in fee, subject to the limitation that the land should be 'inalienable for the period of twenty-five years' from date. This restriction bound the land for the time stated, whether in the hands of the allottee or his heirs. Bowling v. United States, supra. It put it beyond the power of him, or of them, to *alienate the land, or any interest therein,* in any manner except as permitted by the acts of 1896 and 1897. See Taylor v. Parker, 235 U. S., 42, 35 Sup. Ct. Rep., 22. The comprehensiveness of the restriction was modified only by the power to lease; and while the allottee could make leases, as provided in these acts, they gave him no power to dispose of *his interest in the land subject to the lease, or of any part of it. The rents and royalties were profit issuing out of the land.* When they accrued, they *became* personal property; but *rents and royalties to accrue were a part of the estate remaining in the lessor. As such, they would pass to his heirs, and not to his personal representatives.* 1 Washb. Real Prop., 337; Wright v. Williams, 5 Cow., 501. * * *

. "It necessarily follows that the allottee in the present case, having no power to convey *his estate in the land,* could not pass *title to that part of it which consisted of the rents and royalties.* It is said that the leases contemplated *the payment of sums of money, equal to the agreed percentage of the market value of the minerals, and thus that the assignment was of these mon-*

*eys; but the fact that rent is to be paid in money does not make it any the less a profit issuing out of the land.* The further argument is made that the power to lease should be construed as implying the power to dispose of the rents to accrue. This is wholly untenable. The one is in no way involved in the other; the complete exercise of the authority which the statute confers would still leave *the rents and royalties to accrue as part of the estate remaining in the lessor.* It was the intent of Congress that the allottees, during the period of restriction, should be secure in their actual enjoyment *of their interest in the land,"* citing Heckman v. United States, 224 U. S., 413.

The principle underlying the determination in United States v. Noble, supra, that the mineral royalties there under discussion constituted *interests in land* had been announced in that tribunal as far back as 1823, when, in an opinion by Mr. Justice Story, the Court said:

*"A right to land essentially implies a right to the profits accruing from it, since, without the latter the former can be of no value. Thus a devise of the profits of land, or even a grant of them, will pass a right to the land itself.* Shep., Touch., 93 Co. Litt., 4, b. *'For what,'* says Lord Coke, in this page, *'is the land, but the profits thereof?' "*

In Kendall v. Ewert, 259 U. S., 149, U. S. v. Noble, supra, was cited with approval.

The Circuit Court of Appeals in Judge Walker's opinion in the case of W. T. Waggoner Estate v. Wichita County, 3 Fed. Rep. (2d) 962, affirmed by the United States Supreme Court in 273 U. S., 113, declared:

"From the facts that, prior to the making of the leases now in question, the lessor was the owner of the oil in or under the land described, and that nothing contained in those instruments evidences the lessor's consent that the leases *have or retain* as owner the part of the oil produced which the lessee was required *to deliver to the lessor,* it follows that the lessor was the owner of that part of the oil both before and after it was brought to the surface. His property right to mineral oil in or under land owned by him was taxable as real property. Vernon's Sayles' Texas Civil Statutes, 1914, Annotated, art. 7504."

Circuit Judge Hutcheson, in the case of Evans v. Mills et ux., 67 Fed. (2d) 840, was squarely confronted with the necessity to determine whether "A standard oil and gas 'unless' lease * * * for a primary term of ten years, and as long thereafter as oil or gas is produced by the lessee, providing for a money rental during the primary term of $47 annually, in default of

drilling, *and reserving a one-eighth royalty,"* left in the lessors using the leased premises for the purposes of a residence homestead any mineral estate in land, which could be conveyed only as is land constituting the family homestead. In adjudging that the lessors continued to have title to an interest in land, Judge Hutcheson rejected as "mistaken" the argument that the effect of the lease reserving the one-eighth oil royalty was to convey away entirely all their present estate in the minerals, upon consideration of the royalty to be paid *as personalty* for part of the oil the lessee severed and brought up, and *by way of money* for the gas, leaving in plaintiffs no right, title, or interest in the minerals in place, except the possibility of reverter, and working an abandonment of the homestead as to these contingent interests. The opinion then declares that the lessors' interest, including the 1/8 mineral royalty, "does not pass to the lessee; *it remains owned as·realty* by the lessor," citing the Waggoner Estate case (273 U. S., 113); Hager v. Stakes, Tax Collector, supra, and others, including Reynolds v. McMan Oil & Gas Co., supra.

On the subject of rents and profits from lands Mr. Thompson says: "Rent is said to be a certain yearly profit arising out of land and tenements as compensation for the use thereof. * * * Unaccrued rents are not personal property. They are incorporeal hereditaments. They are an incident to the reversion. They pass with a sale or devise of the land. If transferred apart from the land the provision of the statute of frauds relating to sales of land applies. In fact, though separable from the reversion, they are, *until such separation, part of the land.* And it is held that they are real estate under provisions of a tax law providing for the taxation of real estate." Vol. 1, Thompson on Real Property, sec. 240, p. 313, sec. 240, p. 314.

"Thus, if the grantor conveys a fee simple title in the land, reserving rent, he himself has a fee simple in the rent. * * * A rent *reserved* upon a conveyance of land with words of inheritance" (and such is a conveyance of a determinable fee in minerals in place in Texas), *"is real property* and passes to the heirs or devisees of the grantor. * * * *If a rent is reserved, no particular words of reservation need be used,* though such words as *'reserving,' 'rendering,' 'returning,' 'yielding,'* or *'paying'* are used; but *other words* showing the intent will be sufficient." Vol. 1, Thompson on Real Property, sec. 246, p. 320; sec. 247, p. 321; sec. 248, p. 322.

Mr. Tiffany is in full accord with Mr. Thompson. According to Mr. Tiffany: "A rent reserved upon the grant of a fee

simple estate in land is *real property* passing to the heir or devisee. * * * Both the benefit and the burden of a covenant to pay rent upon a demise leaving a reversion in the lessor, run with the land. * * * An assignment of rent already due is an assignment of the rent, that is, of the right to the installments as they come due in the future, is properly *not* an assignment of a chose in action, but is a transfer of an *interest in land.*" Vol. 1, Tiffany on Real Property (2d ed.), sec. 407, p. 1474; sec. 407, p. 1471; and sec. 407, p. 1470.

On the subject of taxation of interests under oil and gas leases, Mr. Summers significantly notes that: "Where, under the ordinary lease, the lessor retains a certain share of the oil or gas as a royalty, the value of such interest may be added to the agricultural value *of the land* for the purpose of making the assessment." Summers, Oil & Gas, sec. 212.

The possibility of reverter is said in Tentative Restatement of the Law of Property (Draft No. 1, sec. 25, p. 56), to be itself *a nonpossessory interest in land.*

We are cited to opposite views found in Thornton's Law of Oil & Gas to sustain the proposition that the properties under consideration should be taxed as personalty. To our minds, no stronger argument against Mr. Thornton's view can well be made than is embodied in his own deductions therefrom. Mr. Thornton says: "Royalty is a certain percentage of the oil after it is found, or so much per gas well developed. * * * Royalty is personal property. * * * The legal effect of a provision in a deed excepting and reserving out of and from a grant at all times thereafter and forever, unto the grantor, his heirs and assigns one-tenth of all the mineral oil that may be obtained by the grantee, his heirs and assigns, from the land granted, to be delivered on the land to the grantor, his heirs and assigns, his or their agent, free of expense, except the furnishing of barrels or other means of transportation, *is to except and reserve in the grantor, his heirs and assigns,* to be delivered as stimpulated, a royalty of one-tenth of all the oil produced, *possessing the same quality of estate as royalty received in an ordinary lease for oil and gas purposes.* * * * A royalty may be assigned or conveyed by the lessor without necessarily assigning the lease or conveying the lease by deed. The assignment does not create an interest in the land; for royalty is personal property. * * * A contract for the sale of royalty arising out of an oil lease does not come within the statute of frauds. *It may be an oral contract.*" 1 Thornton's Law of Oil & Gas (4th ed.), sec. 253, p. 668, 669; sec. 256, p. 676; sec. 287a, pp. 721, 722. (Italics ours).

What we have said determines that all the royalties in both cases must be taxed as interests in land. So much is substantially conceded when plaintiffs in error frankly and rightly assert in their brief and argument, on page 14, that "the real question in this case is whether a royalty interest under an ordinary oil and gas lease, is a taxable interest in real estate."

We will add a few words as to the royalty interest involved under the lease of the unpatented school land survey, which is, as said in plaintiffs in error's argument, "executed by the lessor individually and as agent for the State of Texas."

After upholding the *validity* of the "Relinquishment Act" in Greene v. Robison, the Supreme Court, in an adopted opinion by Judge Sharp, for the first time definitely determined the nature of the interests of the agent-lessor and of his assigns in words concise, clear and unambiguous, viz.:

"In the case of Greene v. Robison, 117 Texas, 533, 8 S. W. (2) 655, it was held that by the terms of the Relinquishment Act it is meant that *the oil and gas in place* shall not vest in the owner of the soil as his property, but that *it means that fifteen-sixteenths of the minerals and one-half of any and all amounts received above 10¢ per acre per annum as rental shall be allowed the owner of the land for his service as agent of the State in making the mineral leases.* In our opinion, the Act when fairly and reasonably construed, also means that all minerals not disposed of go with the title of the land, subject to the provisions of the Act. That when a valid and binding lease or conveyance of the minerals is made by the owner of the land, as the agent of the State, then in that event *he receives the foregoing amounts as compensation for his services. His share of the rentals, royalties and bonuses derived from the leases executed by him become property rights during the period of time for which the lease runs.* Prior to the making of the mineral lease the owner of the land has no right to assign or convey any mineral rights in the property. It is the intention of the law that the owner of the land shall be the agent of the State to execute mineral leases. Whenever a mineral lease executed by a prior owner terminates, the then owner of the land becomes the agent of the State with authority to sell or lease the oil and gas mineral rights, as provided for in the Relinquishment Act.

"The rule is well established that it is not the policy of the law of this State to favor restraints upon alienation of property. *The Courts of this State have established the rule that rents or royalties payable under oil and gas mineral leases are severable and separable from the ownership of the surface*

*estate and are property rights, and having established this with respect to such property, we think, under the policy of the law of this State, that they are assignable by the owner thereof."* Lemar v. Garner, 121 Texas, 502, 512, 513, 50 S. W. (2d) 769.

The Court could not, without overruling Lemar v. Garner, supra, and the settled law re-affirmed therein, and recapitulated in Waggoner's Estate v. Sigler, supra, prescribe a different rule for the rights for the agent-lessor or his assigns, under lease of the unpatented school land surveys from the rule governing such rights under leases of patented lands.

There is another reason which forbids our holding that the interests of the lessors or their assigns are not taxable in Texas as real estate. No one in either case questions that such interests are property. Section 1 of Article VIII of the Constitution plainly provides for the taxation of *all* property. The entire debate is about whether these interests are taxable as personal property or real property. Our statutes declare:

"Art. 7147. 'Personal Property.' Personal property, for the purposes of taxation, shall be construed to include all goods, chattels and effects, and all moneys, credits, bonds, and other evidences of debt owned by citizens of this State, whether the same be in or out of the State; all ships, boats and vessels belonging to inhabitants of this State, if registered in this State, whether at home or abroad, and all capital invested therein; all moneys at interest, either within or without the State, due the person, to be taxed over and above what he pays interest for, and all other debts due such person over and above his indebtedness; all public stock and securities; all stock in turn-pikes, railroads, canals and other corporations (except national banks) out of the State, owned by inhabitants of this State; all personal estate of moneyed corporations, whether the owners thereof reside in or out of this State, and the income of any annuity, unless the capital of such annuity be taxed within this State; all shares in any bank organized or that may be organized under the laws of the United States; all improvements made by persons upon lands held by them, the title to which is still vested in the State of Texas, or in any railroad company, or which have been exempted from taxation for the benefit of any railroad company, or any other corporation whose property is not subject to the same mode and rule of taxation as other property." Article 7147, R. S., 1925.

These interests cannot come within the definitions of money or credits as defined in article 7149, R. S., 1925.

"Real Property," says the statute, "for the purpose of taxation, shall be construed to include *the land itself,* whether laid

out in town lots or otherwise, and all buildings, structures and improvements, or other fixtures of whatsoever kind thereon, and *all the rights and privileges belonging or in any wise appertaining thereto, and all mines, minerals, quarries and fossils in and under the same."* Article 7146, R. S., 1925.

Reading the Constitution and Statutes together there is no escape from the conclusion that interests here involved are meant to be taxed as real estate. Classify them as you may, they are at least rights or privileges belonging or in some wise appertaining to real property, and the Legislature has provided that they be taxed as such. Bracken v. Zan Vandt County, 74 S. W. (2d) 540.

Under practically the same taxation statutes, the Supreme Court of Minnesota, considering minerals in place as "part of the land," and defining royalties on the portion of ore which might be removed annually therefrom, not as purchase money, but as "rents," said:

"Our conclusion is that *unaccrued rents* are real estate, that they are taxed under our tax laws by taxation of the real estate, and that they are not taxed as personal property, and are not to be listed or taxed as 'credits.'" State v. Royal Mineral Association, 132 Minn., 232, 156 N. W., 128, 1918 Anno. Cas., 145, 148. (Italics ours).

■ In the "Hogg Case," the principal complaint in the voluminous attack on the valuations and assessments of the lessors' interests in the land leased is based on the fact that the interest of the lessors was not figured at precisely the same amount as the same fraction of minerals which was conveyed to the lessees and their assigns. Under the very terms of the contract, the lessees having to pay all expenses of exploration and production, each one-eighth out of their seven-eighth mineral interest was necessarily worth less than the one-eighth interest of the lessor. The Court takes judicial knowledge of such differences in values in numberless sales from the beginning of the State's oil industry. On the whole, as we read the undisputed facts, the commissioners' court fairly and without discrimination valued and assessed the interest of or under the lessors, in each instance before us. In the "Federal Royalty Company Case," we are satisfied with the disposition made by the Court of Civil Appeals of the Eighth District of the complaints relative to the means adopted to arrive at correct values by the Commissioners' Court of Pecos County, as well as with that Court's disposition of all other matters not herein specifially discussed.

For the reasons above stated, it follows that in Cause No.

6001, to which reference is made throughout this opinion as the "Hogg case," the judgment of the Court of Civil Appeals should be reserved and the judgment of the District Court should be affirmed; and, it further follows, that in Cause No. 6130, to which reference is made throughout this opinion as the "Federal Royalty Company case," the judgment of the District Court and that of the Court of Civil Appeals should be affirmed. It is so ordered.

## ON MOTION FOR REHEARING.

PER CURIAM.—The motions for rehearing and the several arguments filed in connection therewith have been carefully examined and considered and are overruled.

■ It has been suggested in a motion filed in connection with the motions for rehearing that the opinion be clarified by pointing out more particularly the nature of the royalty interest in Section 32 involved in the "Federal Royalty Company Case" and which section is, for convenience, referred to in the opinion as an unpatented school land survey.

That section, after being classified as mineral, was sold by the State with reservation to the State of all of the minerals. It remained unpatented. The owner of the land under such sale leased the land for oil and gas, acting as agent of the State by the authority conferred in Section 2 of Chapter 81, Acts 2nd Called Session of 36th Legislature, commonly known as the "Relinquishment Act." Under the terms of that Act, one-half of the royalty reserved in the lease belongs to the State and one-half to the owner of the soil, the agent-lessor. A part of the agent-lessor's royalty reserved in such lease of Section 32 was conveyed to Federal Royalty Company, and that royalty so acquired and owned by said company is held by the opinion to be taxable like all the other royalties in both cases as an interest in land. The opinion does not undertake and was not intended to draw a distinction in connection with the taxation of royalties between patented and unpatented sold school land. The State's ownership of the minerals in public school land sold with reservation of the minerals, the land owner's right to lease such land for oil and gas under the Relinquishment Act, and the nature of the royalties reserved in such leases are the same whether the land is patented or unpatented.