THE ATTORNEY GENERAL
OF TEXAS
AUSTIN 11, TEXAS



**WILL WILSON**
**ATTORNEY GENERAL**

May 21, 1958

Hon. Frank R. Nye, Jr.
County Attorney
Starr County
Rio Grande City, Texas

Opinion No. WW-431

Re: Questions concerning the
ad valorem taxability
against Sun Oil Company
as processor of certain
gas designated as plant
operator's portion.

Dear Mr. Nye:

You submit for the opinion of this office two questions
presented in your letter of February 20, 1958. For a com-
prehensive statement of the problem presented we deem it
desirable to quote your opinion request in full, which is
as follows:

"There are a large number of oil and gas wells in
Starr County, Texas, in active production, and which
are subjected to ad valorem taxes by the State,
County, and various Independent School Districts.
Basically, in assessing their taxes, the County (in
behalf of itself and the State of Texas) and School
Districts treat each lease producing oil and gas as
a separate entity, so that the lessee is assessed
7/8 as a determinable fee estate, and the lessor,
or landowner, is assessed the usual 1/8 royalty as
a fee estate.

"Where oil alone (and no casinghead gas or other
liquid hydrocarbons) is produced evaluation poses
no problem. But where casinghead gas and liquids
from gas production are processed off the leases a
complication arises. Plants designed for this pur-
pose have been built; and it is in conjunction with
them that the officials of Starr County are in doubt
about whether all property subject to taxation is
being effectively reached.

"Specifically, the Sun Oil Company constructed a
plant in the San Isidro Community of Starr County
in 1949 which during the year 1956 took the gas from
575 wells. That plant handled 22,904,654 MCF of
such gas during the calendar year of 1956, producing
therefrom 862,335 bbls. of liquids.

"Sun has been rendering to Starr County (for itself and the State) and to San Isidro Independent School, District 7/8 determinable fee estate of all such leases as it owns in that proportion. The owner of the land, or lessor, is assessed his 1/8. In determining the values accepted engineering methods are employed.

"In the operation of its gas plant, mentioned above, wet gas is taken by Sun from the wells on various leases, including its own. This gas is processed in the plant and the stripped gas is returned and re-injected into the gas-producing formation for recycling, or sold as pipeline gas.

"This operation is covered by contracts which provides that a portion of the separated liquids and gas sold as pipeline gas are sold by Sun for the accounts of the lessor and owner of the lease, the Sun retaining a specified portion of such liquids as the 'plant operator's portion.'

"Sun retains as 'plant operator's portion': 75% of the liquids extracted from casinghead gas; 75% of revenue derived from sales of pipeline gas from casinghead processed; 25% of the liquids extracted from sweet gas; and 25% of revenue derived from sales of pipeline dry sweet gas.

"During 1956, production at Sun's San Isidro gas processing plant, according to official production figures on file with the Railroad Commission and the State Comptroller of Public Accounts, amounted to:

| | | | | |
|---|---|---|---|---|
| LHC from Gas Well Gas | 409,609 | bbls. | worth | $1,290,270 |
| LHC from Casinghead Gas | 452,726 | bbls. | worth | $1,426,090 |
| Total | 862,335 | bbls. | worth | 2,716,360 |
| Gas Well Pipeline Gas | 9,304,319 | MCF | worth | 716,430 |
| Casinghead Pipeline Gas | 10,283,720 | MCF | worth | 791,850 |
| | 22,904,654 | MCF | worth | $1,508,280 |

or, a total gross revenue worth $4,224,640. Of this amount, $2,059,520, or approximately 50%, was returned

to the lease operator as his lease share and was taxed the same as oil produced.

"Sun, in rendering their properties in Starr County for ad valorem taxes, have omitted the 'plant operator's portion', (which in 1956 amounted to approximately $2,165,120), described above, maintaining that it is not subject to any property tax, including ad valorem taxes. They argue that the 'plant operator's portion' is a mere processing charge.

"The Commissioners' Court of Starr County and the Board of Trustees of the San Isidro Independent School District of Starr County feel that said 'plant operator's portion' is subject to the ad valorem taxes to be levied by the State and County and said School District for the year 1958; and it is the intention of said officials to make such levy (applying the same ratio of assessment as is applied to all other real property owned and rendered by Sun) if said 'plant operator's portion' is property within the meaning of the law subject to ad valorem taxes.

"Said officials have also indicated that it is their intention, if it can be legally done, to retroactively assess such 'plant operator's portion' for the years the same has been omitted from the Sun Oil Company's renditions subsequent to the construction of its gas processing plant.

"In analyzing these facts it appears to this office that two questions arise:

(a).  Is said 'plant operator's portion', as described above, real property subject to ad valorem taxes?

(b).  If the answer to (a) is in the affirmative then: Is said 'plant operator's portion' subject to retroactive assessment for any years it may have been omitted by Sun from its rendition of property for ad valorem taxation?"

The Sun Oil Company is designated in this opinion as "plant operator." The lessees (whether owing an 1/8 royalty or 7/8 working interest) will be designated the "producer."

The question we must answer is whether or not under contracts between Sun Oil Company, the plant operator, and various owners of gas leases, the portion which you have

designated as "plant operator's portion" is real property subject to ad valorem taxes. To answer this question it becomes necessary to examine and construe the contracts between the Sun Oil Company, the processor and the producers or owners of the leases from which the gas is produced.

It appears that Sun Oil Company, plant operator, processes gas from the leases involved under two types of contracts. We have been furnished copies of these contracts. The first is a casinghead gas contract. Under the terms of this contract Sun agrees to buy the casinghead gas produced by the lessee owner. The title to the gas is transferred to Sun at a certain delivery point, usually at the casinghead at the well. Sun agrees to pay for said gas, a price based upon what Sun receives for the gasoline processed (up to 1/3 of proceeds) and up to 50% of net proceeds from the sale of the residue gas, and we construe net proceeds to mean gross proceeds less cost of purifying, boosting and transporting the gas. Also, the price paid shall be based on a percent of the price received for sale of butane and propane. The contract is for a term of ten years, either party having the right to terminate the contract on any anniversary date by thirty days' notice.

The second contract as related to the problem here involves a processing of the gas by Sun from various leases, none of which are owned by Sun. In this processing contract Sun agrees to process the gas, remove all liquids and impurities and deliver the residue gas back to the producer. This contract further provides that title to the gas remains in the producer who delivers the gas to Sun at the junction point on the gathering line in close proximity to the gas wells. The producer assigns to Sun 100% of the plant products recovered from gas delivered under the contract when, as and if recovered. The price paid for the products is the price received for such products on the basis of a scale attached to the contract showing gasoline content of the raw gas processed. There is by terms of the contract also a permissible deduction from producer's credit for a dehydration fee. This processing contract is on a year to year basis, terminable at the option of either party on sixty days' notice prior to the end of any calendar year.

It is stated in the opinion request that the full 1/8 royalty and the 7/8 working interest in the gas has been rendered and assessed for taxation for each year the plant has been in operation. In other words, 8/8 or all of the gas has been rendered for taxation by the owners in proportion to their respective interest.

Article 7146, Vernon's Civil Statutes, defines real property for the purpose of taxation:  This is as follows:

"Real property for the purpose of taxation, shall be construed to include the land itself, whether laid out in town lots or otherwise, and all buildings, structures and improvements, or other fixtures of whatsoever kind thereon, and all the rights and privileges belonging or in any wise appertaining thereto, and all mines, minerals, quarries and fossils in and under the same."

The pertinent portion of this statute to this problem is ". . . and privileges belonging or in any wise appertaining thereto, and. . . minerals. . . in and under the same." Gas in place under land is a right and privilege belonging to the land and constitute minerals. It is therefore real property subject to taxation under the foregoing definition of real property for the purpose of taxation. This has become well established as the law of this state in such cases as Sheffield v. Hogg, 124 Tex. 290, 77 S.W.(2d) 1021; Tennant v. Dunn, 130 Tex. 285, 110 S.W.(2d) 53; and State v. Quintana Petroleum Co., 134 Tex. 179, 133 S.W.(2d) 112. If therefore, "plant operator's portion" of the gas is gas in place it is taxable to the operator, otherwise not.

In view of the statement that the 1/8 royalty and the 7/8 working interest have been rendered and assessed for taxation for each year the plant has been in operation which constitutes the whole 8/8 interest in the gas, any other taxable interest must of necessity be carved out of the 1/8 royalty or the 7/8 working interest, or both. Otherwise, we would run into the question of double taxation forbidden by Article VIII, Section 1 of the Texas Constitution.

Clearly, under Article 7146, V.C.S., the value of the gas, as realty, for ad valorem tax purposes, is its value in place, prior to severance. Natural gas in place must and does, of necessity, include all its component elements. Art. 7040b Sec. 2(5) (V.C.S.) Carbide Carbon Chemicals Corp. v. Texas Co., 21 F. (2) 199; Lone Star Gas. Co. v. Stine, 41 S.W.(2) 48; Lone Star Gas Co. v. Harris, 45 S.W.(2) 664.

Therefore, if the gas has a value in place it includes all the constituent elements thereof for ad valorem tax purposes. To put a value on the gas in place and then attempt to add thereto the value of the separated constituent elements of said gas after it has been manufactured or separation process has made it more valuable as personalty, would, within

itself, constitute a double assessment and would be unconstitutional under Article VIII, Section 1 of the Texas Constitution. It is therefore apparent that the gas as real property was or should have been fully assessed before it was severed and processed as personalty in Sun's processing plant. Reverting to the contract between Sun, the processor, and the lessee, producer, it is noted that several functions are necessarily performed by the processor from the time the gas is delivered to its gathering lines to the time the residue gas is delivered to interstate pipe lines. Under certain circumstances the contract may be cancelled. For example, if the water or sulphur content is too high or the liquid hydrocarbon content is too low, the processor may cancel the contract. The contract runs from year to year only, terminable at the will of either party. Also, the processor is not obligated to take all of the gas for processing. It may take casinghead gas from other wells other than the producer's wells, or if its capacity is insufficient it may take gas ratably. Conversely, the lessee is not obligated to deliver the full amount of the gas contracted for, if it would injure the efficiency of lessee's well or wells. These facts do not, in our view, partake of a vested title to gas as realty in place, for either party may terminate such alleged title at will. Where Sun, the processor, takes delivery of the gas is likewise important. Under the contract Sun takes delivery into its gathering lines at the junction point near the well and transports it under low pressure to its processing plant. The contract further provides a junction charge for transporting the gas. The gas must be compressed to from 800 to 1,000 pounds of pressure psi in order to enter Sun's transmission line. A charge is made for this service. Instead of lessee paying Sun, the processor, in cash for all the services which are necessary to make the gas merchantable and profitable, these service charges are paid in kind out of the plant products extracted, and this is what is designated as "plant operator's portion."

The only title that passes to Sun is the title to "plant operator's portion", and this we think is personalty and not realty. The fact that the contract provides that Sun is compensated for the services performed by a portion of the products produced from the gas, rather than in money does not constitute Sun the holder of any right or privilege in the leasehold estate of the lessees with whom they have contracted. Under the following cases, Stephens v. Stephens, 292 S.W. 290, Writ Dism.; Choice v. Texas Company 2 F. Supp. 160; Chafin v. Hall, 210 S.W.(2) 289, rev. on other grounds 276 S.W. (2) 774, It is held that when oil or gas are removed

from the land they become personalty. We think that "plant operator's portion" received and retained by it under the contract constitutes personalty and not realty, and may not be taxed as realty. The courts have construed contracts somewhat analogous to the one involved here, in cases such as Martin v. Amis, (Com. App.) 288 S.W. 431; Lone Star Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W. (2) 504. These cases do not involve questions of ad valorem taxation, but do bear upon the character of estate or ownership resulting from contracts quite analogous to the contract here between Sun, the processor, and lessees, the producer, and they hold that no interest in the realty from which raw gas is produced is acquired by the processor.

The case of Martin v. Amis deserves further notice. The lease considered by the court in this case provided that the lessor would receive 1/8 of all oil and casing-head gas and gas produced, manufactured, and saved from the lease premises. Gordon, the lessee, contracted to sell the gas to Chestnut-Smith Corporation to be processed by it and the extracted gas and residue gas was to be sold. The processor agreed to pay the lessee 25% of the net amount received from the sale of the gasoline and 50% of the price received for the residue gas, such residue gas being determined by scale attached to the contract. The processor paid the lessee 7/8 of the amount received for the 25% of the gasoline extracted and the royalty owners 1/8 of said 25%. The royalty owners brought suit against the lessee and the processor for 1/8 of the total value of the gasoline extracted. The court held that under the lease the lessee had to either sell the raw gas or process it and that lessee had fulfilled its obligation by selling the raw gas. The royalty owners, however, contended as expressed in the opinion of the court, as follows:

> "The contention of Amis is to the effect that the written contract, under which the raw gas was received by such corporation, is in legal effect a contract for the hire of said corporation to manufacture the gasoline as the servant of the producer of the raw gas; but this contention is untenable. The terms of said contract have been stated. An examination thereof leaves no doubt of their legal effect. They evidence an executory contract of sale of raw gas, as personalty . . . . Such title or property as (lessees) held in said raw gas passed to said corporation: The former did not own any part of the raw gas when gasoline was manufactured from it; the Chestnut-Smith Corporation held it

under claim of ownership. The manufacture of such gasoline, therefore, is not imputable to (lessees) and they are not chargeable with liability in that respect under the Gordon covenant.

"Amis (royalty owner) in his pleadings, seeks to hold the Chestnut-Smith Corporation to performance of the Gordon covenant in so far as same relates to gasoline. Said corporation cannot be held to performance of such covenant in any respect, for the reason the corporation does not stand in privity with the estate in oil and gas in place, that was granted the Gordon Company under the Gordon lease; nor has it assumed any of that company's obligations or become chargeable in equity with performance thereof. Its acquisition of raw gas produced from the realty granted in the Gordon lease occurred after such gas had become personalty by a severance from the soil. It holds no interest in the realty from which such raw gas was produced." (Emphasis supplied.)

The court concluded that the royalty owners were entitled only to 1/8 of 25% of the net amount received for the gasoline sold. In the case of Saulsbury Oil Co. v. Phillips Petroleum Co., 142 F(2) 27, Cert. Denied; 323 U.S. 727; 89 L.Ed. 584, there was involved a casinghead gas contract between lessee and Phillips to process the gas and return the residue to the lessee and to market the rest. In this case the court said:

"We condlude that the title to the casinghead gas passed to Phillips upon the delivery thereof into its gathering lines."

Sun owns some gas leases from which it processes its own gas. This, however, does not present in principle a different problem from that posed with respect to the leases not owned but from which, under the contract, it processes the gas for a portion of the products extracted. The only difference is that Sun owns all of the gas and must render and pay taxes upon it in place until it is severed and processed. As to this gas wholly owned by Sun, "plant operator's portion" is not involved. Sun, owning the gas, likewise would own all of the products derived from processing. A question quite analogous to the one presented by you is answered in a former opinion of this office, O-3938, a copy of which is herewith enclosed for your information.

This opinion is not to be construed as holding that "plant operator's portion" and the products derived from Sun by processing its own gas are exempt from taxation. It should be taxed as personal property as other personal property is taxed.

We therefore conclude that your question (a) should be answered in the negative. This renders unnecessary an answer to your question (b).

### S U M M A R Y

The portion of the products received and retained under a processing contract between the Sun Oil Company and certain producers of natural gas which Sun, as processor, retains as a processing charge does not constitute gas in place, and is not taxable as real property but is taxable as personal property. Gas owned by Sun under leases which it holds is subject to ad valorem taxation as real property so long as it remains in place unsevered and unprocessed, but after severance and processing the products derived therefrom do not constitute real property subject to taxation, but should be taxed as personal property.

Very truly yours,

WILL WILSON
Attorney General of Texas

By

Assistant

LPL:db

APPROVED:

OPINION COMMITTEE:

Jack Goodman, Acting Chairman

Milton Richardson
Tom McFarling

REVIEWED FOR THE ATTORNEY GENERAL

By W. V. Geppert