**JAPHET et al. v. McRAE et al. \***
**(No. 538–4375.)**

(Commission of Appeals of Texas, Section B. Oct. 28, 1925.)

1. **Mines and minerals ⚙⟹79(1)—Where land subject to lease is subdivided and sold, royalties from producing well belong to owner of tract on which well is sunk.**

Where 15-acre tract of land subject to an oil and gas lease, was subsequently subdivided and sold, and 5-acre portion became property of plaintiffs, and 10-acre portion, property of defendants, upon which latter tract a producing oil well was sunk, held that, royalties from oil produced on such 10-acre tract belong to defendants, and owners of 5-acre tract have no interest therein.

2. **Mines and minerals ⚙⟹79(7)—No presumption that part of oil from well on one tract of land is being drained from adjoining land.**

There is no presumption as a matter of law that part of oil from well on one tract of land is being drained from adjoining land.

Error to Court of Civil Appeals of First Supreme Judicial District.

⚙⟹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Rehearing·denied December 10, 1925.

Action by Charles C. McRae and another against Dan A. Japhet and others. The Court of Civil Appeals rendered judgment (269 S. W. 829), reversing a judgment of the trial court for defendants, and defendants bring error. Judgment of Court of Civil Appeals reversed, and that of district court affirmed.

Carlton & Meredith, of Houston, for plaintiffs in error.

Vinson, Elkins, Sweeton & Weem and Chas. C. McRae, all of Houston, for defendants in error.

POWELL, P. J. In December, 1915, Wilbur Fisher and wife executed an oil, gas and mineral lease to the Producers' Oil Company on a certain 15-acre tract of land out of the William Bloodgood augmentation survey in a portion of what is now called Barbers' Hill oil field, in Chambers county, Tex. Subsequently, Fisher, the original lessor, conveyed to Walter Keeble, one of the defendants in error here, the north 5 acres of said 15 acres. Keeble then conveyed to Charles C. McRae, the other defendant in error here, an undivided 3 acres out of his north 5 acres. Some 18 months after he sold 5 acres of the land to Keeble, Fisher, the original lessor as aforesaid, sold to the same Walter Keeble the remaining south 10 acres of the 15-acre tract. On the same day Keeble conveyed that very same 10-acre tract, for a very large profit, to Dan A. Japhet, one of the plaintiffs in error here.

The various deeds conveying these lands were in the usual form of general warranty deeds, and all referred to the lease to the Producers' Oil Company, which was itself in the usual or commercial form of oil leases. There is nothing whatever in any of the deeds providing for an apportionment of the one-eighth royalty retained by the owner of the fee among the various subdivisions of the 15-acre tract. The deeds contained no language from which it could be said that any apportionment of royalty was in the mind of the parties at the time they were executed. Keeble, undoubtedly, could have written his deed to Japhet in such a way as to provide that the latter should take the 10 acres of land by metes and bounds, but should have only ten-fifteenths of the one-eighth of any oil produced from any part of the 15 acres. But no such provision is in the deed. On the contrary, the deed expressly provided that Japhet should have all the rights which the original lessor had in the 10 acres. This is a case where it is contended that the law itself, in the absence of contract to the contrary, requires an apportionment of the one-eighth royalty. In this respect, it is unlike the case of Hoffman v. Magnolia Petroleum Co., 273 S. W. 828, very recently decided by this section of the Commission of Appeals and the Supreme Court. We will discuss this law point more fully later.

After Japhet bought the 10 acres of land, he succeeded in having the oil company, as the lessee, develop his 10 acres. Under the lease, of which all parties had notice when these various deeds were written, the lessee could develop any part of the 15 acres just as it saw fit to do. Much oil was discovered on the 10 acres. McRae and Keeble filed this suit for five-fifteenths of the one-eighth royalty from this oil, although their 5 acres had never been developed. The trial court, upon an agreed statement of facts, denied the recovery sought, and awarded all the money to Japhet. The money itself, under agreement of the parties, is being deposited in a Houston bank to await the termination of this suit.

The Court of Civil Appeals at Galveston reversed the judgment of the trial court and rendered judgment in favor of McRae and Keeble for one-third of the royalty. See 269 S. W. 829. There is a lengthy statement of the case by the Court of Civil Appeals. We think it unnecessary to make any further statement. We have stated the facts material to a decision of the one law point which controls the judgment to be rendered in this case. We shall now discuss that one law question.

[1] Counsel for Japhet contend that:

"Where the lessor of land for oil and gas, subsequently to the execution of the lease, but prior to the development of the land and the production of oil or gas under the lease, sells a portion or portions of the land to others, and oil and gas are thereafter produced under the lease from some portion of the leased premises, the royalties therefrom belong to the owner of the particular tract upon which the well is located, and the owner or owners of other portions of the leased premises have no interest therein."

If this rule is correct, then the trial court's judgment should be affirmed. On the other hand, if the converse of the rule just stated is correct, as Keeble and McRae contend, the judgment of the Court of Civil Appeals should be affirmed. Which is the correct rule in this connection presents an interesting question. It is the first time the Supreme Court of Texas has ever had an opportunity to pass upon it. We have given most thorough consideration to the able briefs and arguments on file in this case and reviewed all the authorities most carefully. We have also felt unusually free, because of the importance of the question, to consult with the Supreme Court before preparing our report. We have concluded that the rule contended for by plaintiffs in error is the better one, and that the judgment of the trial court was correct. In this conclusion, we follow the great weight of authority. For instance, we are in line with the following states:

Arkansas: Osborn et al. v. Arkansas Territorial Oil & Gas Co., 103 Ark. 175, 146 S. W. 122.

Indiana: Fairbanks v. Warrum, 56 Ind. App. 337, 104 N. E. 983, 1141.

Ohio: Northwestern Ohio Natural Gas Co. v. Ullery, 68 Ohio St. 259, 67 N. E. 494.

Oklahoma: Kimbley v. Luckey, 72 Okl. 217, 179 P. 928; Pierce Oil Corporation v. Schacht et al., 75 Okl. 101, 181 P. 731; Galt v. Metscher, 103 Okl. 271, 229 P. 522; Gypsy Oil Co. v. Schonwald, 107 Okl. 253, 231 P. 864.

West Virginia: Pittsburgh & West Virginia Gas Co. v. Ankrom, 83 W. Va. 81, 97 S. E. 593, 5 A. L. R. 1157; Musgrave v. Musgrave, 86 W. Va. 119, 103 S. E. 302, 16 A. L. R. 564.

The only opinions contrary to our views, so far as counsel cite or we can find, are the Pennsylvania case of Wettengel v. Gormley, 160 Pa. 559, 28 A. 934, 40 Am. St. Rep. 733, and 184 Pa. 354, 39 A. 57, and the Texas case of Gillette v. Mitchell, 214 S. W. 619. The latter case was by the Court of Civil Appeals at Galveston, and that court has again held the same way in the case at bar. It has continued to follow the Wettengel Case in Pennsylvania. The Gillette Case could go no further than the Court of Civil Appeals.

No other Texas court has passed upon this question except the Court of Civil Appeals at San Antonio in the case of Hoffman v. Magnolia Petroleum Co., 260 S. W. 950. That court rendered its decision upon the language of the instruments there involved. It was not necessary for the court to pass upon this apportionment of royalty rule. But the court clearly expressed its approval of the majority rule presented here by counsel for Japhet. The authorities we have cited are full and give the reasons pro and con for the conflicting views upon this issue. We shall not quote from these decisions. It would unduly lengthen our opinion. They are accessible to the attorneys in the case. We think the reasoning by the majority of the courts is sound. They answer every contention of any possible merit on the contrary side.

[2] If the rule we approve is just in all the states where it is followed, it is also just in Texas. We are not unlike the other states in any matter of substance which affects this matter. Our Supreme Court has held that oil is a part of the realty until brought to the surface, and that it can be sold in place. Japhet unquestionably bought the realty in the 10 acres. He bought one-eighth of the oil in or under that land. The lessee had the right to take full charge of the land so far as necessary to get the oil from under it. He had the title to the oil for that purpose. But, when it was brought to the surface, Japhet had the right to his one-eighth thereof. He had an equitable title to his interest in that oil, and if the lessee had made any effort to take it away from him, Japhet would have been entitled to sue him as for conversion of his property. It seems to us that the only possible justification for permitting McRae and Keeble to participate in these royalties coming out of the Japhet wells would be on the presumption, as a matter of law, that a part of the oil from the wells on the 10 acres was being drained from their 5 acres. Should there be any such legal presumption? We think not. It is well known that oil wells and dusters are found side by side within a very few feet of each other. If the Japhet wells were draining oil from the lands of any one else, it would be impossible, in the absence of proof, to say whether such drainage was north, south, east or west of the Japhet tract. But, before the drainage could possibly affect defendants in error, it must come from the north. It is entirely possible that if McRae and Keeble should be allowed one-third of this money, they would be receiving it when there was not a drop of oil on their land. It is, in any event, unjust to take away the property apparently belonging to one party and give it to another until it is shown that the latter party has been deprived of it.

If the oil on the 15 acres in this suit should be apportioned, because the entire tract of land was under one lease, then where will we stop? Will the courts say they will apportion royalties provided the lease does not cover more than 1,000 acres, or more than 10,000, or more than some other acreage arbitrarily fixed? Or will they say that apportionment will apply, unless the contrary is expressly provided for, in all lands under the same original lease? If this rule should be enforced, we would have a situation of this kind. Upon the submission of this case, it was stated, and not questioned, that the Humble Oil & Refining Company has one lease covering 1,000,000 acres of land from the same owner. One corner of that land is 75 miles from one of its other corners. The land is in several counties. Suppose the owner of the land should sell 75 acres in one corner to a party interested in oil, and who thinks he knows oil land when he sees it. He counts confidently on the one-eighth royalty attaching to that 75-acre tract. He induces the original lessee to develop his land, and a gusher is forthcoming. Under the rule urged by defendants in error, the man discovering this 75-acre tract as the most valuable of the entire million acres for oil purposes would be entitled to only seventy-five one-millionths of the one-eighth royalty of the oil coming out of the gusher on the 75-acre tract. Can we say such a rule is just? A party owning another 75 acres, 75 miles distant, would get as much from the oil as the man whose 75 acres has the producing gusher. And yet this man without the gusher might not have a single drop of oil under his land, which is 75 miles distant from the gusher. Such a rule would, in our opinion, be entirely impracticable. Many oil leases cover thousands of acres of land. As our Supreme Court has held, oil is fugitive in its nature, and ordinarily should belong to him who captures it and brings it to the surface. The quest for it involves tremendous expense and a vast element of chance. In spite of the

scientific knowledge of the geologists, the industry still partakes largely of a gamble. It seems to us that the only safe rule, and the only one free from much confusion, is one which gives the oil to the man who owns the land upon which the well is located. Clearly, it would not be right to award the oil to those who, like Keeble and McRae, offered no proof that any of it was drained from under their 5-acre tract.

Our conclusion is not unjust, as we see it, even if there were a possibility that the 5 acres were being drained by the Japhet wells. Keeble knew that the lessee had the right to drill anywhere at its pleasure. He knew that part of the 15 acres might never be developed. Still, he allowed Japhet to select 10 definite acres. He traded with his eyes wide open to the rights of the various parties. He expressly sold to Japhet the one-eighth royalty retained by the original lessor so far as the 10 acres were concerned. He must be held to have known that the 10 acres might be first developed, and, if so, that the oil thereunder would belong to Japhet and the lessee. Keeble was not required to sell any of the 15 acres. If he wanted the oil which might be found under any part of the 15 acres, he should have retained it all or expressly sold off only an undivided interest in the royalty under the entire 15 acres. That course seems fairer than to wait for others to develop a certain portion of the tract and then ask for a division of the developed tract.

While the majority rule does not seem to perpetrate any injustice on defendants in error, the contrary rule would work a grave injustice to Japhet. He paid $10,000 cash for this 10-acre tract, practically worthless except as an oil prospect. Keeble made a profit of $2,000 on the deal, and he turned it in one day. His money was not invested long. Japhet could have bought the 10 acres and accepted a deed to an undivided ten-fifteenths of the royalties in the 15 acres. But he did not do so. If he had known that Keeble wanted one-third of the oil coming from wells on the 10 acres he was buying, he doubtless would have vigorously objected to it. He bought no partnership interest in oil. It is an injustice to him to make him divide his oil after he had exercised his own best judgment and selected the 10 acres where he thought the oil was. The description of the 10 acres by metes and bounds was utterly useless under the minority rule. Under that doctrine, Japhet would get only ten-fifteenths of the oil royalty whether he bought a certain 10 acres or merely an undivided 10 acres. It is wrong to force him to do something he did not contract to do.

The various states are beginning by statute and supervision to make certain rules governing the duties of lessees. Particularly is this true with reference to the duty on the part of the lessees to drill offset wells on adjoining leases. As this great industry develops, other laws will doubtless be passed regulatory of operation by lessees. But such laws will not take away the rights of parties which have already become vested. The courts should not make contracts for people overturning those they have voluntarily and fairly made for themselves.

In the Gormley Case, the Pennsylvania court said there would be no apportionment of coal or other solid minerals. But, the court said, oil and gas were different. The court seemed to think that each of the 600 acres would probably produce an equal amount of oil. This case was written 30 years ago, and the courts did not know as much about the mysteries of oil as they do now. Actual experience shows that the Pennsylvania court is very much in error in assuming that oil is anything like equally distributed on 600 acres of land, or any other number of acres.

For the reasons stated by the great majority of all the courts which have passed upon this question, as well as those stated by ourselves, we think the judgment of the Court of Civil Appeals should be reversed and that of the district court affirmed. We so recommend.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.