GRIFFITH, et al. *v.* GULF REFINING Co., et al.

Oct. 6, 1952.

No. 38566          2 Adv. S. 9          60 So. 2d 518

Nov. 24, 1952     9 Adv. S. 36     61 So. 2d 306

*Howie, Howie & Montgomery,* for Griffith, et al. in the consolidated cases.

*Archie D. Gray, Irwin W. Coleman, James A. Boone,* and *W. B. Fontaine* argued the following stated points:

*W. C. Wells, III, Earl T. Thomas, Wagner & Christian,*
Amici Curiae.

OPINION IN CHIEF.

LEE, J.

B. C. Griffith and others, as royalty owners of 90 acres in a 250 acre unit in the Gwinville Field, by this suit, seek to recover from Gulf Refining Company and others a pro rata share of gas produced from the unit.

Their bill of complaint alleged these facts: The Federal Land Bank of New Orleans deeded to T. B. Slater and Bill Booth 530 acres of land, as therein described, reserving one-half of the mineral rights. Thereafter on June 28, 1937, Slater and Booth executed to Gulf Refining Company a ten year mineral lease of their one-half interest. Subsequently Gulf released of record 280 acres of this land, retaining only 250 acres. On August

26, 1939, Slater and Booth divided this 250 acre tract and sold to Reggie and Lurleen Lee the north 90 acres and to Hollie and Myrtle Lee the south 160 acres, in each instance without reservation. On April 23, 1940, the Federal Land Bank executed a lease of its reserved mineral interest to I. P. LaRue; and he, in turn, on May 2, 1940, assigned his lease to Magnolia Petroleum Company. Gulf applied for and on January 25, 1947, obtained a permit to drill on the 250 acres; and on August 27, 1947, filed with the State Oil and Gas Board a map of the Slater. et al. gas unit, composing that acreage. A gas well was completed in 1947 on the south 160 acres, or the Hollie Lee part of the unit. The gas allowable for the well was, at the instance of Gulf, fixed on the basis of 250 acres and such allowable has been subsequently produced from the well. Royalty has been paid to the holders of interests in the 160 acres, but no part thereof has been paid to the holders of interests in the 90 acre tract. Complainants alleged that $1,800.00 had already accrued to them on account of royalty at the time of the filing of the suit, and they prayed for discovery as to the exact amount, and for an accounting as between the defendants.

A general demurrer by the defendants that "there is no equity on the face of the bill" was sustained, and the complainant, B. C. Griffith, appeals.

The question for determination is whether the present owners of royalty in the 90 acre tract are entitled to share in the production from the 250 acre unit, when the well is actually located on the 160 acre tract.

Appellees contend that royalties are payable only to those with interests in the land on which the well is producing, and that no apportionment of royalties can be made in the absence of contracts or provisions to that effect. They cite a number of cases on this point. It is not necessary to list the authorities from other jurisdictions inasmuch as Merrill Engineering Co. v. Capital National Bank, 192 Miss. 378, 5 So. 2d 666, recognized the

well settled rule to be that **(Hn 1)** ''where the owner of a tract of land leases the same as a whole for oil and gas and thereafter subdivides the land into several tracts and conveys the same without reserving the royalty interest therein, the purchasers of each of such several tracts will only acquire the right to receive the royalty in any oil or gas produced from a well on his individual property.''

While the above case, which recognized the common law rule, was decided in 1942, the rights there under consideration had their inception in 1931, prior to the enactment of Chapter 117, Laws of 1932, and prior to the adoption and promulgation by the State Oil and Gas Board of spacing and other conservation regulations, which the legislature, in the exercise of the state's police power, authorized by said Chapter. **(Hn 2)** Consequently, the common law rule is now limited and circumscribed by the conservation rules and regulations of the Board, which were in effect at the time of the accrual of the rights of the parties here.

So the question here must be viewed in the light of the statutes and the orders of the State Oil and Gas Board which were in effect prior to this operation, and the acts and conduct of the appellees. Secs. 6141 and 6142, Code 1942, required that notice of the intention to drill a gas well should be given to the State Oil and Gas Supervisor and he, in turn, should collect the requisite fee before granting a permit.

By paragraph (b), Sec. 6140, Code 1942, it was made the duty of the State Oil and Gas Board to prorate and regulate the gas well production from each common source of supply ''for the protection of public and private interests, and to adjust the correlative rights and opportunities of each owner of gas in a common source of supply to produce, use or sell such gas''. And by paragraph (d) of said section, the Board, in determining the allowable production of each well, was required to ''take into account equally the acreage of the tract on

which the well is located and the open flow capacity of the well".

The above statutes were forerunners of Chapter 256, Laws of 1948, and amendments thereto. It will be seen that the same general idea permeates the declaration of public policy in Sec. 1 of said Chapter as follows: "To protect the public and private interests against the evils of waste in the production and utilization of oil and gas, by prohibiting waste as herein defined; to safeguard, protect and enforce the co-equal and correlative rights of owners in a common source or pool of oil and gas to the end that each such owner in a common pool or source of supply of oil and gas may obtain his just and equitable share of production therefrom; . . .".

In California Company v. State Oil & Gas Board, 200 Miss. 824, 27 So. 2d 542, it was held that the legislature had the power to prescribe the general rule and regulation as to the spacing of gas wells; that it could delegate this power to an administrative agency; and that it did so by Sec. 5, Chapter 117, Laws 1932, Sec. 6136, Code 1942.

The State Oil and Gas Board, by orders dated August 30, 1945, August 28, 1946, August 11, 1947, and September 11, 1947, provided that drilling units in the Gwinville Field should consist of 320 contiguous acres for one gas well. Green et al. v. Superior Oil Co., et al., 59 So. 2d 100; Superior Oil Co. v. Foote, et al., 59 So. 2d 85. The limitation of one gas well to 320 acres was conceived to be in aid of the legislative purpose and such spacing has been in force and effect since 1945.

(Hn 3) Since Slater and Booth made no reservations in the deeds to the 90 and 160 acre tracts, the Lees, in each instance, acquired a 1/16th royalty interest in their respective tracts. Gulf and Magnolia, as lessees, owned the exclusive right to drill for and produce gas on this acreage; and in the spacing and drilling of a well, they represented the royalty owners. Superior Oil Co. v. Foote,

et·al., supra. They were not licensed to commit waste or impair the property rights of the royalty owners. Millette v. Phillips Petroleum Co., 209 Miss. 687, 48 So. 2d 344. They were not required to consult the Lees as to where the well should be drilled. Of their own accord, they chose to merge both tracts together as one drilling unit. They applied for and obtained a permit to drill on this unit. The map which they filed designated it as the T. B. Slater et al gas unit, and as composing the two tracts. They drilled and completed the well on the 160 acre part of the unit. They applied for and obtained a gas allowable for the entire 250 acres in the unit. Although the spacing pattern was 320 acres, the Board had the power to make exceptions, and it did so in this instance. Appellees have been producing and selling gas from 250 acres of land. Thus they have evidently been draining gas from the 90 acres also. To all intents and purposes, they have built a fence around the lands in which appellants are interested. Neither production nor utilization of gas in which they have an interest can be had by the appellants. On the contrary, appellees have taken it for their own use and have paid nothing therefor. It is unthinkable that the 90 acres can be utilized, as alleged by the complainants in this case, and its royalty owners receive nothing while the owners of the 160 acres receive all of the benefits.

On account of the fact that the well is evidently draining the 90 acre tract and that the owners of such acreage are thereby contributing to the production, actually the owners of the 160 acres must be getting more than they are entitled to, and this at a time, when those on the 90 acre part of the unit are receiving nothing. When these two parcels of land were merged into one drilling unit, the imaginary line between them was obliterated insofar as the production of gas was concerned.

In Placid Oil Co. v. North Central Texas Oil Co., Inc., et al., 19 So. 2d 616, 206 La. 693, in the order of the Commission provision was made for the establishment

of drilling units of 80 acres, to be composed of any two adjacent 40s. The oil company procured a permit to combine two 40s into one unit and drill in the center of one of these. Parten owned a 3/32ds royalty interest in the 40 on which the well was drilled, but only a 1/64th interest in the other. The Louisiana Court held that the two 40 acre tracts were in fact unitized, and that Parten was entitled to receive only in the proportion that his interest in the two 40s bore to the whole unit.

If instead of the course followed in the present case, the oil companies had made their distribution pro rata for the whole unit, the foregoing Louisiana case would have been a complete answer to a claim by the royalty owners of the 160 acres for all of the production.

It is not necessary for us to say generally how far the rights of parties are affected by integration. In this case, however, the appellees, through their conduct, received certain benefits which normally accrue from integration. When they procured and accepted such benefits, it follows that, in like manner, they assumed the burdens incident thereto.

The allegations of the bill of complaint, as against the demurrer, are taken to be true. (Hn 4) Under such circumstances, therefore, the denial of a remedy to the appellants would be contrary to certain maxims of equity:

"Equity regards and treats as done that which in good conscience ought to be done." Vol. 1, par. 364, p. 675, Pomeroy's Equity Jurisprudence, 4th Ed.

"Equality is equity, or equity delighteth in equality". Par. 405, p. 762, id.

"Equity will not suffer a wrong without a remedy." Sec. X, page 790, id.

(Hn 5) Since Gulf and Magnolia pooled their leasehold interests without the consent of these royalty holders, they were, therefore, under the duty to preserve the property rights of such royalty owners. Superior Oil Co. v. Foote, et al., supra. Since they failed in the performance of

this duty, the appellants are entitled to a remedy, that is, to share in the production from this unit. Moreover, discovery should be available to ascertain and determine the amount; and too an accounting between the several appellees may be necessary in the attainment of justice.

These observations dispose of appellees' contention that, if appellants have a remedy, it is in the circuit court in their Cause No. 38511.

Appellees also argue further that, when the permit was granted, there was no existing authority which could compel the integration of separately owned properties to create a unit for the drilling of a gas well which would compel the royalty owners to participate in the proportion that their ownership bore to the whole.

However, in Superior Oil Company v. Foote, et al., supra, the application to drill a gas well on Unit 32 therein was filed with the board on April 23, 1948, and the permit was issued on April 28, 1948, prior to the effective date of Chapter 256, Laws of 1948, and, of course, prior to the enactment of Chapter 220, Laws of 1950. Yet, on application of the oil company, the interests of the royalty owners in that instance were integrated by the Board, and that action was affirmed here, although the determination of the exact interest was not before this Court, and for that reason, was not made.

In justice to the Magnolia Petroleum Company, it should be stated that the bill of complaint specifically alleges that this defendant has paid its royalties on the proper basis. Relief is sought against it only for discovery and for an accounting.

From what has been said it follows that the demurrer was improperly sustained, and on that account, the cause should be, and is, reversed and remanded.

Reversed and remanded.

All Justices concur.

ALEXANDER, J. (concurring).

The opinion of the Court is sound in both reason and result. The rule of capture was recognized in Merrill Engineering Company v. Capital National Bank, 192 Miss. 378, 5 So. 2d 666, wherein it was stated that the assignee of a lease covering a tract in a pooled area "still had the right to drill elsewhere on the pooled area for the second well and for as many other wells as it deemed necessary for the proper development of the area". So that in the instant case, but for the regulatory orders of the Oil & Gas Board, the appellees could have captured gas from any other separate area of the designated spacing unit.

But the spacing orders of the Oil & Gas Board now deny to the appellees the right to capture gas upon the 90-acre tract in which appellant owns an interest and denies to appellant the right to demand further drilling. Yet appellees contend for the right to drain the lands of Griffith and share the spoils with the owner of the 160-acre tract through which the gas potentials of Griffith are being siphoned.

We must at once brush aside such cases as the Japhet v. McRae, 276 S. W. 669, and Bruce v. Ohio Oil Co., 169 F. 2d 709, which deal with common law principles of unrestricted capture. Since the right of Griffith to drill or demand drilling has been taken away by the establishment of the drilling unit and the issuance of a permit he is left with only the questionable privilege of extracting from his situation whatever satisfaction he may derive from a knowledge that he is contributing at his expense to the welfare of his neighbor. He is compelled to love his neighbor more than himself. A valuable right has been taken away without compensation. It is with difficulty that the argument of appellees can be followed in their contention that to permit Griffith to share in production is to take from the owner of the 160-acre tract royalties which belong to him. On the contrary he is

taking from Griffith royalties which should, but for the spacing regulations, have accrued to Griffith.

Despite the holding in the Bruce case, supra, that in a similar situation the owners of royalty on the developed tract are entitled to all the royalty thereon, that court felt impelled, no doubt under the pressure of elemental justice, to add ''and the operator would become liable for an additional amount to the royalty holders under the other tract.'' That court had just previously stated: ''Common knowledge tells us that the purpose of the unitization of two separately owned tracts is to permit the drilling of a single well and yet preserve to all interested parties their property rights in their respective tracts''. There was thus manifested a willingness to stand with the owner of the developed tract and, through the barricade which shut out the complainant, peer with sympathy at her plight.

Insofar as fields of production have been controlled by spacing and drilling rules the common law is not controlling. Operators are not under law but under grace. In these areas drilling is by permission and under supervision. Since all our conservation laws from 1932 to date have been enacted in the public interest and for the conservation of these resources and for the general welfare, they must be held to take away no more than they give. It is not only property which is conserved but rights. Not only is waste to be prevented, but also injustice.

The controlling opinion sets forth the several statutes. In them all, there is repeated emphasis upon the protection of correlative rights of all interested parties. Under the formal procedures for voluntary or compulsory pooling or integration, as set out in Sec. 10, Chapter 256 of the Laws of 1948, there is brought forward this just purpose in paragraph (b) ''The board shall in all instances where a unit has been formed out of lands or areas of more than one ownership, require the operator when so requested by an owner, to deliver to such owner or his assigns his proportionate share of

the production from the well common to such drilling unit, provided, however, that such owner receiving same shall provide at his own expense proper receptacles for the receipt or storage, of such oil, gas or distillate.'' Equity will follow the analogy of the law. 30 C. J. S., Equity, Sec. 103, p. 505.

Now let us see what appellees contend for. They demand the right to designate a drilling unit of 250 acres which includes the lands of Griffith, and (1) to shut him off from any development of his 90 acres; (2) to perpetuate the lease against forfeiture during production; (3) to borrow or appropriate the production under the 90-acre tract in order to procure an allowable based on the entire 250 acres; and (4) to retain 7/8th of such production based on the denominator of 250 acres and to turn over to the holders of royalties on the 160-acre tract 1/8th of the entire production. Griffith's hands are tied; he becomes an unwilling philanthropist. The area may not be constituted a unit for appellees and not also for appellant.

It is contended that the enforced limitation as to the area and the drilling of a single well thereon gives to the operator all the privileges of integration and none of the burdens. This is to say, that he or the lessees may proceed only to the point of maximum advantage and stop short of an advance into the area of duties. It may be presumed that the well will drain the entire special unit of 250 acres since it has been so officially adjudicated by the Board as to this field. Under the circumstances the inherent equities which controlled the decision in Millette v. Phillips Petroleum Co., 209 Miss. 687, 48 So. 2d 344, become relevant.

Griffith's rights trace back to those of Slater and Booth and back to the Federal Land Bank. They inhere in the land. If the lessees would have been compelled to honor the rights of the Bank they must also recognize and respect the rights of its assignees. Yet under the view of appellees the Bank, if after leasing the entire

tract and it had been later cast into a drilling unit, the lessees could drill upon a tract of one acre therein previously sold to a third party, and thereby cut itself off completely from the royalties all of which would be taken over by such third party. Indeed, such a situation met with the righteous indignation of the Louisiana Court in Sun Oil Co. v. Stout, 46 So. 2d 151, which follows the just path theretofore laid out in Placid Oil Co. v. North Central Texas Oil Co., 206 La. 693, 19 So. 2d 616.

Appellants' reliance upon Republic Nat. Gas Co. v. Baker, 197 Fed. 2d 647, is hailed as a recent supplement to their contention. The land involved is located in Kansas which seems to pay homage to the rule of capture. The court brushed aside any doctrine of apportionment but recognized that the hardships of the common law doctrine could be and were frequently avoided by an entirety clause. It deemed that a proration order was the equivalent of a pooling or integration order, a view apparently at variance with the Placid Oil case. I do not understand that our controlling opinion renders unnecessary or unavailable the right of the appellant and other owners of separate tracts within the established unit to pool or integrate their interests under Sec. 10, Chapter 256 of the Laws of 1948, as amended. Our decision in the companion case, No. 38,511, similarly styled and this day decided, would be inconsistent with such view.

I am impressed more by the able dissent of Huxman, J. in the Republic case. Since it is so thoroughly in accord with the views above expressed, I quote therefrom, the following: "In fixing the allowable for this well, the Commission considered the 640 acre tract as a production unit held under a single lease. It took into consideration the rights of the unit to production from the common pool with respect to other like units of production. It also took into consideration the fact that gas was being produced from the entire tract through the one well on the Southeast Quarter. It fixed an allow-

able based upon production from the entire tract and in an amount which would return to the lessor and the lessee their fair share of gas recovered from the entire tract. Hicks could not have demanded that Republic drill other wells. No drainage was taking place. The conservation law took from Hicks his right to demand the drilling of additional wells, under the theory that a lessor has a right not only to be protected from drainage, but also has the right to demand full development of the entire tract in an orderly and expeditious manner. The intent and effect, indeed the purpose, of the allowable fixed for this well was to return to Republic its fair share of production from the 640 acres with respect to surrounding tracts and to return to the interested royalty holders (in this case Hicks) his share of royalty production from the entire tract.

"Had Hicks remained the owner of the entire royalty interest, he would have received the royalty resulting from the production from the entire tract. When subsequent to the execution of the lease he assigned royalty interest in severalty under different parts of the unit, his assignees stepped into his shoes and acquired all his rights against the lessee.

"The royalty holders have only such rights under the one lease as their assignor had. We are not dealing with separate tracts or separate royalty interests in the sense that the holders thereof must execute oil and gas leases. These royalties all stem from Hicks' interest retained by him under the lease. To hold that the Corporation Commission may not consider this 640 acre tract covered by one valid lease as a unit of production and protect the correlative rights of the lessor and the lessee, as well as those whom come in by assignment, from either of them is to deprive the Commission of all power to carry out the policy of the conservation statute looking to the elimination of waste, unnecessary and wasteful drilling of innumerable wells and yet protect the correlative rights of all interested parties."

The controlling opinion has succinctly stated these conclusions. It needs no supplemental support. It is fortified with sound equitable principles. The public policy of our conservation laws has already been adverted to. "The general principles of equity will not be applied to frustrate the purpose of the laws or to thwart public policy. Equity will not permit that to be done by indirection which, because of public policy, cannot be done directly." 30 C. J. S., Equity, Sec. 89, p. 458. As stated in Dogan v. Cooley, 184 Miss. 106, 185 So. 783, "Rules of practice and procedure are designed to secure the justice of the law, not to defeat it. The rules are valuable guides, and will ordinarily be adhered to and followed. But where the rules would defeat the justice of the law, and bring about results not justified or intended by the substantive law, they may be subordinated to the primary purpose of the law, that is, the enforcement of rights or the redress of wrongs, in the interest of justice." Moreover, since the equality which is equity applies to both benefits and burdens he who derives an advantage ought to sustain the burden. Broome, Legal Maxims (8th Ed.) page 705. Here the appellees have by their acts placed Griffith at a distinct disadvantage and in availing of a procedure for their benefit have sought to dispossess him of any remedy for his displaced rights.

If my views have been unduly extended they serve at least to emphasize convictions, the expression of which have not heretofore found occasion.

### On Suggestion of Error.

Hall, J.

In a lengthy Suggestion of Error appellees vigorously assail our opinion in this case (60 So. 2d 518) which was concurred in by every member of the Court. They state that we have simply brushed aside the authorities upon which they rely and they insist that two of the cases cited by them are directly in point and on allfours with the present case.

The first of these is Mueller v. Sutherland, (Tex.) 179 S. W. 2d 801. That case was decided after the enactment of a conservation law in Texas, but nevertheless relied in part upon the earlier Texas case of Japhet v. McRae, 276 S. W. 669, which was decided under the rule of capture prior to the time when Texas had adopted any conservation law. We have held, as necessarily we must, that the conservation law of this state has the effect of discarding the rule of capture. Moreover, the Texas conservation law, unlike that of Mississippi, expressly provides ''it is not the intention of this Act to require repressuring of an oil pool or that the separately owned properties in any pool be unitized under one management, control or ownership.'' Vernon's Civil Statutes of Texas, Article 6014, paragraph (g).

The other case which we are said to have disregarded is Republic Natural Gas Company v. Baker, 197 F. 2d 647, from the United States Court of Appeal for the 10th Circuit. That case was decided under the law of Kansas and in the third paragraph of the majority opinion it was specifically pointed out that the rule of capture is applicable in Kansas. Furthermore, Judge Huxman, the only Kansas judge sitting on the case, wrote a dissent which we think is more in accord with principles of justice and equity.

(Hn 6) It is our conception that we are free to decide for ourselves all questions arising under the common law or under the statutory provisions of this state, that we are not bound by the decisions of courts of other jurisdictions on similar questions, that it is proper for us to consider them and that we may follow them only if we are satisfied of the soundness of the reasoning by which they are supported. 21 C. J. S., Courts, Section 204. Such decisions may have persuasive authority and we may still refuse to follow them if opposed to the public policy of this state. 14 Am. Jur., Courts, Section 85. They may be entitled to respectful consideration if well

reasoned and are promotive of justice, but they are not technically of force as precedents and we are at perfect liberty to disregard them. New York Life Insurance Company v. Ware, 171 Miss. 341, 157 So. 359.

The original opinion herein pointed out the public policy of Mississippi as expressly stated in our conservation statutes and we shall not here repeat it. We do call attention, however, to some of the things said by us in Millette v. Phillips Petroleum Company, 209 Miss. 687, 48 So. 2d 344: "It is elemental that parties may not contract contrary to expressed public policy so that while the express provision regarding the drilling of offset wells may be upheld, there remains a fundamental principle founded as well in equity as in policy that an owner or lessor is entitled to reasonable protection against the loss of mineral resources in his lands. The express provision here involved absolved the lessee from meeting his duty to the lessor by capturing lessor's oil in situ through wells drilled on lessor's lands. The equitable duty, existing as well under implication, to conserve the mineral resources of lessors or to refrain from depletory act survives unimpaired. . . . There is an implied covenant in a lease of oil property that the lessee will do nothing to impair the value of the lease, and must use reasonable care to protect lessor from damages or loss by the affirmative act of such lessee. . . . Although oil is a fugacious product and ordinarily belongs to the producer who captures it upon his own lands, yet when such producer is under an obligation to do nothing to destroy or deplete the lands of his lessor, he may not with impunity impair the value of his lessor's property. Such an obligation gains equitable recognition when substantial drainage is caused by the lessee himself."

Gulf Refining Company's lease covers an undivided one-half mineral interest in the entire 250-acre tract here involved, and Magnolia Petroleum Company's lease

covers the other undivided one-half mineral interest therein. Magnolia recognizes its duty to its lessor as above stated and is paying royalties from production to Griffith in proportion to his mineral interest in 90 acres of the 250-acre tract. **(Hn 7)** Gulf refuses to recognize its obligation and refuses to pay any royalties to Griffith because the well was not drilled on the 90-acre tract and argues that this action is justified because Griffith acquired his mineral interest after the execution to Gulf of the lease on the 250-acre tract, yet Gulf's lease specifically provides that "If the estate of either party hereto be assigned, and the privilege of assigning *in whole or in part* is hereby expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors, or assigns." Gulf and Magnolia combined their leases on the 250-acre tract under a joint operating agreement. They obtained a special exception from the State Oil & Gas Board so as to authorize the drilling of one well on the 250-acre tract instead of the usual 320-acre unit prescribed for the Gwinville field. They selected the spot on which they would drill and at all times since completion of the well in 1947 they have obtained an allowable upon the basis of 250 acres. In our view it is revolting to every conception of justice and equity that Griffith could be tied down under our conservation law so as to prevent his drilling on the 90 acres and be compelled to sit idly by and see his 90 acres drained to the last cubic inch of gas with no right to share in the production therefrom simply because he acquired his interest after execution of the lease and because the lessees chose to drill on the adjoining 160 acres. Such a holding would be the equivalent of converting the lease from a bilateral to a unilateral contract. Under the lease on the 250 acres Gulf claims the right to make one unit out of the entire tract, to drill thereon and to maintain rights of way over and across the 90 acres for access to its well and

for the building of installations thereon for the processing of the gas taken from the well, to construct and maintain pipe lines for the purpose of transporting the gas across the 90 acres for sale elsewhere; it claims that by the drilling on the 160 acres it has perpetuated the lease as to the 90 acres and as evidence of that claim it is taking the production allowable on the basis of 250 acres and is thereby ostensibly draining the 90 acres; in other words it claims every right granted under the lease as to the 90 acres and is unwilling to recognize its express obligation under the lease to pay the one-eighth royalty thereon or its implied obligation to prevent drainage. We are unwilling to lend judicial sanction to these irreconcilable claims of Gulf.

So far as we can find the first case in which this question was ever raised is Wettengel v. Gormley, 160 Pa. St. 559, 28 A. 934, 40 A. S. R. 733, decided by the Supreme Court of Pennsylvania in 1894. It specifically upholds our view that Griffith is entitled to royalties under the 90-acre tract and we quote from the opinion therein as follows: ''The question raised by this appeal is both novel and interesting. It is presented upon the following facts: James Gormley was, in his lifetime, the owner of three contiguous farms, containing about 600 acres. In July 1888, he made an oil lease to Tomlinson, covering all the land. It was to run for 15 years, and reserved a royalty, upon all the oil produced, of one-eighth. The lease gave the lessee the usual privileges upon the land, among which was the right to take water from any part of it, and to any extent needed in his operations; a right of way into and over the body of the land; a right to lay pipe lines to conduct oil from the wells. It concluded with the following stipulation: 'It is understood between the parties to this agreement that all conditions between the parties hereunto shall extend to their heirs, executors, and assigns.' The lessor died in October, 1890. By his last will and testa-

ment he gave one of these farms to each of his three children in fee, making no mention of the lease, which included them all. The devisees have entered into possession of their respective farms under the will of their father, and each holds in severalty. The holder of the oil lease has, meantime, put down several oil wells, and is producing oil therefrom. These wells happened to be on the farm devised to James T. Gormley, the defendant, and he claims the entire royalty. The question is thus seen to be, who is entitled to the royalty reserved by the ancestor? Should it be divided between the three devisees in proportion to the acreage held by each, or should it be paid to James T. alone? The answer to this question must depend partly upon the character and legal effect of the lease, and partly on the nature of the product obtained under it. . . . It conferred an exclusive right upon the tenant to take the oil that might underlie the whole 600 acres, and gave him 15 years within which to take it. It was, in legal effect, a sale of the oil, for the removal of which the surface and the subsurface were subjected to the necessary servitudes. The subsequent division of the body of land by the lessor could not divide or diminish the privileges of the lessee or change his covenants. The lessee may locate his wells where he pleases, regardless of the interests of the devisees of his lessor. He may distribute them over the 600 acres, or locate them all on one of the subdivisions. He may crowd the lines of the adjoining divisions so as to enable him to draw the oil from them without drilling upon them, and in this manner deplete, ultimately, the whole territory by operations conducted on the farm of one of the devisees. . . . The rules applicable to coal leases, or leases of land containing any other solid mineral, are therefore not always capable of application to leases for the production of oil or gas, because of the difference between the solid and the fluid minerals, and because of the deficient conditions under which they are

found and brought to the surface. There is in this state no precedent which we are constrained to follow, and we cannot find that the question has been decided in any other of the oil producing states. We are in a position, therefore, to consider and determine it on principle. For the reasons now briefly outlined, we concur in the conclusions reached by the learned judge of the court below.''

Our position is fully supported not only by the above Pennsylvania case but also by Placid Oil Company v. North Central Texas Oil Company, Inc., 19 So. 2d 616, 206 La. 693, which was cited in the original opinion herein, and is also supported in part by Dillon v. Holcomb, 110 F. 2d 610, and Sun Oil Company v. Stout (La. App.), 46 So. 2d 151. The Suggestion of Error is accordingly overruled.

All the Justices concur.