JONES, Chief Judge,
dissenting:
I respectfully dissent from the conclusion reached by the majority. The findings of fact clearly show that there was .an outright sale of the Corpus Christi stock to The Chicago Corporation; that payment was made partly in cash and partly in overriding royalties.
*578 These royalties were wholly unlike the house or apartment rental illustration which is used in the majority opinion. The royalties were a part of the corpus of the property and were in no ordinary sense a payment for a use of the property. It is as if the purchaser of the house or apartment in question had sold a 1/20 interest each year until the entire house or apartment had been disposed of.
In other words, every barrel of oil that is taken out of the ground is a part of the property itself, and when the oil has been taken out of the property by the royalty, the entire ownership is gone.
Although there were several steps involved, the deal through which plaintiffs’ stock in Corpus Christi was sold to Chicago, partly for cash and partly in return for the overriding oil and gas royalties, was in reality a single transaction. As I view it, the controlling point in these cases is the fact that the overriding royalties received by plaintiffs had no ascertainable fair market value at the time plaintiffs transferred their interests. In the many cases treating of oil and ,gas royalties for the’ purpose of deciding whether there has been a gain or loss under section 111 of the 1939 Internal Revenue Code for property sold or exchanged, it has always been held that the question of whether the royalties received ■by the taxpayer have an ascertainable fair market value is a ■question of fact. Where the factors affecting the valuation are so uncertain, contingent, or speculative that the value cannot be determined with reasonable accuracy, it must be held that the oil and gas interests have no fair market value. That is the situation here as found by the trial commissioner who heard and considered all the evidence bearing on the -question. The reasons for this finding of lack of any market value at the time of the transfer are set out in findings 30, 31, and 32. For some reason the majority has seen fit to eliminate these findings.
I think these findings are vital and should be restored. 'They reveal the issue here to be very similar to that decided by the Supreme Court in Burnet v. Logon, 283 U.S. 404. The facts affecting the value of the overriding royalties in the instant cases contain more uncertain, unusual, and specula-five elements than were present in other cases where it was *579 held that the oil and gas interests considered had no ascertainable fair market value. Edwards Drilling Co. v. Commissioner, 35 B.T.A. 341; Rocky Mountain Development Co. v. Commissioner, 38 B.T.A. 1303. The facts before us show that the only petroleum product of any consequence recovered by Corpus Christi from the land up to the time plaintiffs’ ¡stocks were disposed of was wet gas. There was no market for the gas and the market for the distillate extracted therefrom was unstable and uncertain. Just prior to the closing of the transaction in suit, the' only prospect held out to plaintiffs for recovering the money they had sunk in the venture was the revamping and enlarging of the recycling plant at an •expenditure of $855,000 and by the drilling of additional oil wells. It was suggested that additional products could be recovered from the new plant but whether there would be a market for these and at what price was not known. Oil production was negligible and most of the property was unproven territory. The petroleum engineers who made the reports described in the findings pointed out the indefinite and unknown conditions existing in a considerable portion of the leased land and neither would hazard an estimate as to future oil production. As part of the price for plaintiffs’ •stocks, Chicago agreed to drill additional oil and gas wells, but as shown in finding 9, this obligation was subject to contingencies which might never occur.
Added to the above, we have the undisputed showing that plaintiffs failed in their efforts to have several major oil companies place a value upon or make an offer for the properties. Not only were no offers forthcoming, but one major oil company with extensive holdings in the same general area advised plaintiffs to dispose of their interests as quickly as possible.
The taxing authorities placed a value of $1,035,000 on the interests of the minority stockholders, but this valuation was, -of necessity, a pure estimate. There are formulas and equations available for estimating the value of almost any kind of property where the use of such methods is appropriate. But ■estimates do not meet the statutory test of “fair market value.” If these words mean anything, they assume, first, the existence of a market for the particular property, and, *580 second, the presence of sufficient facts to enable fair-minded men to determine the value in that market within the bounds of reasonable accuracy. If the next day or shortly thereafter it had been shown that only dry holes could be found,, there is not the slightest doubt that the plaintiffs could have come back and shown the inaccuracy of the collector’s estimate, and could have on that ground secured a deduction or a refund. In other words, these estimates are not necessarily final.
The facts in this record demonstrate that when plaintiffs’' stocks were sold, the circumstances that would normally be relied upon to determine market value were shrouded in uncertainty and dependent upon the outcome of future developments. In the light of that record, I would adopt all the findings made by the trial commissioner and hold that since the overriding royalties had no ascertainable fair market value, the sale of plaintiffs’ stocks resulted in an open transaction. On this basis, the payments received by plaintiffs from the sale of the oil and gas produced from the land would be taxable as long-term capital gain because of the open transaction aspect, but no allowance would be made to plaintiffs for. depletion. Burnet v. Logan, supra; Commissioner v. Carter, 170 F. 2d 911.
Laramore, Judge, joins in the foregoing dissenting opinion.
FINDINGS OF FACT
The.court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. The Corpus Christi Corporation (hereinafter called Corpus Christi) was organized under the laws of Texas on August 19,1938, for the purpose of acquiring and developing oil and gas properties covering approximately 8,782 acres in Jim Wells, Kleberg, and Nueces Counties, Texas, known as the Wardner Ranch properties. At the time of acquisition by Corpus Christi, the properties had only four producing wells, and these wells were producing only gas, for which there was no market, or a. poor grade of distillate extracted from wet gas and used to make a third-grade gasoline which *581 was a drug on the market at that time, since the oil companies were trying to increase the octanes of their gasoline. Under the Texas conservation laws, to develop these properties with any hope of profit, it was necessary to construct a high pressure recycling plant for the purpose of extracting the distillate from the wet gas and reinjecting the dry •gas into the ground. The former owners had expended about $25,000 in having an analysis of the property made ■by the Steams-Eogers Corporation to' determine whether a recycling plant could be profitably operated. The only other recycling plant of any kind in operation at that time was owned by Eoser-Pendleton. However, that plant had to deal with pressures of about 300 pounds, whereas it was known that any recycling plant to be used on the Wardner Eaneh properties would have to deal with pressures of from 2,800 to 3,100 pounds. It was estimated that the cost of such a plant would be about $2,500,000. In addition to the cost of the plant and the unknown hazards of recycling at the high pressures mentioned, two extremely expensive blow-outs had ■occurred in fields adjacent to the Wardner Eaneh prior to the organization of Corpus Christi. These blow-outs increased the risk that the operation of the plant would prove unprofitable.
2. Corpus Christi was organized and the transaction involving the acquisition of the Wardner Eaneh oil and gas properties was completed largely through the efforts of William K. Warren, who was chairman of the board and chief executive officer of Warren Petroleum Company, as well as an officer or director in a number of oil and gas companies and associations. On the reputation of Warren Petroleum Company, the First National Bank of Chicago agreed to loan Corpus Christi $750,000 and Warren induced The Chicago Corporation (hereinafter called Chicago) to .loan $500,000 in return for 20 percent of the stock of Corpus Christi. The Warren interests loaned Corpus Christi $160,000. Corpus Christi entered into a contract with the Steams-Eogers Corporation for the construction of the recycling plant. This was a pioneering venture in the oil and gas industry, since it was the first recycling plant operated under high pressures. In view of the expense and hazard *582 involved, Corpus Christi persuaded the owners of the royalties, reserved by the surface owners when the land was leased for oil and gas development, to reduce their royalties from one-eighth to one-sixteenth.
As of May 5, 1951, Corpus Christi owed its stockholders $710,000 and the debt to the bank was more than $2,500,000.
3. The principal shareholders of Corpus Christi were plaintiff, William K. Warren, and certain trusts created by him;. J. A. LaFortune, and certain trusts created by him; plaintiff, Howard E. Felt, and certain trusts created by him; Clyde Alexander, John Sheerin, and Chicago. W. K. Warren was elected president, Clyde Alexander vice president, and Howard E. Felt secretary-treasurer.
The capital stock consisted of only 5,000 shares of $1 par value stock. The high ratio of debt to equity was due to' the feeling by Warren and his associates that if the venture proved to be a failure, the loans made to Corpus Christi could be charged off by the lenders as bad debts, whereas that would not be possible if Corpus Christi was heavily capitalized.
On May 5,1941, one-fourth, or 1,250 of the 5,000 shares of Corpus Christi, was owned by Chicago, a corporation organized and existing under the laws of Delaware. The remaining three-fourths or 3,750 shares were owned by 28 persons and trusts, including plaintiffs.
4. Before Corpus Christi was organized, L. B. Herring, a reputable petroleum engineer and geologist, made a report dated May 3, 1938. The report was prepared to determine the “type o'f structure, thickness and number of productive sands, the probable producing acreage, and an estimate of the amount of gas and distillate” underlying the land. Attached to the report were contour subsurface maps of the area, based on electrically determined logs taken from wells on the Wardner Banch and adjoining land. The report stated that there were 2,125 proven acres and 875 unproven acres with an estimated distillate reserve of 22,363,000 barrels, based on anticipated production from 3,000 acres.
After Corpus Christi acquired the Wardner properties, Herring was on a retainer most of the time by Corpus Christi for the purpose of providing information as to where *583 to locate the input wells and the producing wells. He made reports to and conferred with Corpus Christi officials many times each month. He made a second written or supplemental report to Corpus Christi on February 1, 1939, based on additional information including core borings and logs in three producing sands and bottom-hole pressures taken from wells that had been drilled. He concluded that the proven reserves of distillate amounted to 9,200,985 barrels and estimated that the unproven reserves were 10,320,000 barrels. His report covered only a portion of the Wardner Ranch and stated that it was impossible to estimate the extent of production in the area south of San Fernando Creek and in Kleberg County on the land. He made no estimate of oil production or of oil reserves.
Corpus Christi also had a seismograph survey made of the property and the report thereof showed the existence of numerous faults over the area. The stockholders of Corpus Christi considered that the report was inaccurate, because gas had been recycled through two of the faults shown in the report, and this could not have been accomplished if the faults had been in existence. Therefore, no reliance was placed on the seismograph survey.
5. J. Earle Brown, also a reputable petroleum engineer and geologist, made three separate reports on the properties. The first of these, dated December 29, 1939, was made for Chicago and was designed to show the amount of distillate that could be recovered from the existing and planned wells. His report covered four producing sands and three proven-nonproductive sands, and he estimated that the recoverable condensate from these sands amounted to 7,256,512 barrels. Brown made a second report in July 1940, which was not offered in evidence, and a third report dated January 9,, 1941, in evidence as defendant’s exhibit 1. The last report which was made to Corpus Christi contained his estimate-of reserves and returns based upon extensive improvements and additions to the recycling plant, and the drilling of 62' additional oil and gas wells. On the basis of figures supplied by the Hudson Engineering Corporation, he recommended an expenditure of $855,000 for increasing the capacity of the plant and providing facilities to enable Corpus Christi *584 to recover a large percentage of the butanes and practically .all of the propanes and heavier constituents from the gas. He also recommended the drilling of six new gas wells in the proven area and of two new wildcat locations in the unproven area at an estimated cost of $35,000 per well. In addition, he advised the drilling of 58 additional oil wells in the proven area and estimated that the cost of each would he $30,000. He made no estimate of oil reserves or oil ■production.
Brown’s report pointed out that the entire structure on the southern and western sides of the properties was indefinite and that the problems of oil reserves, gas, and water •contacts in the sands on the west side of the known subsurface fold were still unsolved. His estimate of the recoverable •condensate from the ultimate well pattern recommended in his report was 9,500,389 barrels. At the time of his report, •distillate was selling at a price of between $1 and $1.20 per •barrel, but Brown used a price of $1.30 a barrel for the •period of operation covered by his report. For oil he used a price of $1.25 a barrel. On the basis of the reconstruction ■of the recycling plant and the additional gas wells to be -drilled, he estimated that the net return from the recycling plant would be $7,504,056. He also estimated that the net return per year on each of the oil wells which he recommended to be drilled would be $8,800.
6. By May 5, 1941, there were 18 or 19 producing wells ■on the property. The recycling plant, which had been constructed at a cost of about two million dollars for extracting ■distillate from the wet gas, had been in operation for about :two years. The problems of operating the plant under high pressure and of determining how the gas would perform in its migration from the input wells to the production wells had been solved to the satisfaction of Corpus Christi’s stockholders. However, the development of the tract had been •confined to an area covering 2,200 acres with no development on approximately 6,000 acres. Production had also 'been limited to two producing sands, although four had been tested. Oil production was negligible, and there was still no market for the dry gas. The only product from which the company derived appreciable income was distillate and *585 the market for it was unstable and uncertain. It was sold, in truckload lots to any buyers who could be found. Frequently, the distillate had to be stored by Corpus Christ! before a market could be found. Sometimes it sold for less-than raw crude oil.
In 1941 Warren and a number of the other stockholders: decided to dispose of their stock for several reasons. The-amount of money which they had loaned to the corporation and that borrowed from the bank had increased to the-extent that the founders felt the best they would be able to-do was to repay the loans without making any profit on the transaction. After the receipt of Brown’s 1941 report,, consideration was given to changes in the design of the plant in order to permit the manufacture of liquefied petroleum; gases, along with some motor gasoline and kerosene. However, the corporation did not have the funds to drill the additional oil and gas wells or make the additions to the-plant as recommended by Brown. It was felt that it would' not be possible to borrow the additional money needed. At' the same time, the stockholders gave consideration to the fact that most of them were then in the 90-95 percent income-tax brackets and that if the expanded program proposed by Brown should be successful in producing additional income,, most of it would be paid out in the form of taxes. Accordingly, Warren first approached Chicago with the suggestion-that it purchase the stock of the other stockholders. Two or three different proposals were considered, but none of them-were acceptable. Warren and his associates then talked to-the Seaboard Oil Company which was unable to place a value on the property. Warren also discussed the possibility-of the sale of the stock to the president of the Continental Oil Company, who stated he did not know whether the-property was worth as much as the debts outstanding against it. His company would make no offer for the stock. On several occasions, Warren discussed disposition of the stock with the president of the Humble Oil and Refining Company.. That company was not interested in the Corpus Christi properties, because Humble held oil and gas leases on the vast acreage of the nearby King and Kennedy Ranches and was not developing it. Later the president of Humble advised! *586 Warren to dispose of bis stock in Corpus Christi as quickly •as possible.
In further discussions, it was learned that Chicago desired •to acquire all of the stock of Corpus Christi so that it could take over the development and operation of the oil and gas ■properties, including the refining operation. As a minimum, •Chicago wanted to acquire sufficient additional stock to bring its ownership to 80 percent of the stock of Corpus Christi. This was the amount required to bring about a liquidation under the laws of Texas and the amount necessary for a tax-free liquidation of a corporate subsidiary under Section .112 (b) (6) of the Internal Revenue Code of 1939,
7- In their discussions with Chicago, Warren and the other ¡stockholders demanded a cash payment plus overriding •royalty interests. The term “overriding royalty” in the oil and gas industry means a fraction of the working interest which by agreement is relieved of the expense of the development and production. The working interest is the interest (usually seven-eighths) in the oil, gas, and other minerals acquired by a lessee when land is leased for exploration and production.
8. As a result of the negotiations, a plan was formulated, whereby Chicago was to acquire the stock of the other stockholders, liquidate Corpus Christi, and develop and operate the oil and gas properties owned by Corpus Christi. In return for the sale of their stock to Chicago, the other stockholders were to receive certain cash payments plus conveyances of overriding royalty interests in such oil and gas properties. The several steps required in the consummation of this transaction were set forth in written offers (identical 'in terms except for the number of shares owned by the •offeree) to each of the other stockholders of Corpus Christi on May 5, 1941. In these offers, Chicago offered to buy all but not less than a stated number of shares owned by the •offeree for $163.63 per share, plus an additional amount of not more than $54.55 per share, contingent upon its income ■tax liability on the liquidation of Corpus Christi. Each •offer was contingent upon Chicago’s acquisition of sufficient stock to bring its holdings to 80 percent of the total stock •outstanding. In the offers, Chicago agreed that, after it *587 •acquired not less than 80 percent of Corpus Christi stock, it would wote its shares in favor of a plan of liquidation, whereby each of the minority stockholders, including plaintiffs, would receive for each share of stock of Corpus Christi then owned by him and in complete cancellation and liquidation thereof, the following interests which were to be free •and clear of all charges, costs, and expenses of development, 'operation, and exploration and were to be free of all liens •and encumbrances:
*****
(a) An overriding royalty interest of .01875 of 1 per cent of 8'/8ths of all oil, gas and other minerals in and under and that may be produced and saved, if, as and when so produced and saved, from the oil, gas and mineral leases and leasehold estates now owned by The Corpus Christi Corporation in Nueces, Kleberg and Jim Wells Counties, Texas.
An overriding royalty interest of .01875 of 1 per cent of 8/8ths of all products extracted, separated and saved from gas produced from said premises if, as and when so extracted and separated.
*****
(b) The sum of $150, payable out of l/10th of 1 per cent of l/8th of the proceeds of all oil, gas, distillate, condensate and other minerals and petroleum products that may be produced, extracted and saved, if, as and when produced, extracted and saved from the oil, gas and mineral leases and leasehold estates now owned by The Corpus Christi Corporation in Jim Wells, Kleberg and Nueces Counties, Texas, being the same properties described hereinabove, but only to the extent of production had after the payment of the balance due on an existing production payment owned by Camp Oil Company, a Texas corporation, according to the terms of a written instrument executed by Camp Production Company, in favor of Camp Oil Company, dated August 13, 1938, and recorded m the Oil and Gas Records, Nueces County, Texas.
*****
9. In the offers made to the other stockholders, Chicago also agreed to drill sufficient wells on the mineral leases owned by Corpus Christi to reasonably develop the leases for the production of both oil and gas, subject to the following conditions:
*588 (a) That in no event shall The Chicago Corporation be obligated to cause more than sixty (60) oil wells to be drilled.
(b) That in no event shall The Chicago Corporation be obligated to cause any oil well or wells to be drilled if the average posted price by the three largest purchasers in Jim Wells, Kleberg and Nueces Counties, Texas, of crude oil of like kind and grade as that produced from the said properties of The Corpus Christi Corporation is below One Dollar ($1.00) per barrel.
(c) That in no event shall The Chicago Corporation be required to cause to be drilled any gas well or wells not reasonably necessary for the capacity operation of the recycling plant of The Corpus Christi Corporation or not reasonably necessary to supply the allowable production of gas or its derivatives from the said properties.
(d) That in no event shall The Chicago Corporation be required to cause the drilling of any gas well or wells when the market price at Corpus Christi, Texas, for condensate of like kind and grade as that produced from the properties of The Corpus Christi Corporation is below One Dollar ($1.00) per barrel.
(e) That in no event shall The Chicago Corporation be obligated to cause to be drilled any oil wells when a sum computed by multiplying (i) seven-eighths of the then average per well monthly oil allowable as fixed by the Railroad Commission of Texas, or other regulatory bodies having jurisdiction over crude petroleum oil produced from said premises, for the then producing oil wells located on the properties described herein in the horizon to which the well then proposed is to be drilled, times (ii) ten cents (10$) less than the then average per barrel posted price by the three largest purchasers in Jim Wells, Kleberg and Nueces Counties, Texas, for crude oil of like kind and grade as that produced from said properties, times (iii) sixty, does not equal or exceed a sum computed by adding (i) the then reasonable cost of drilling and equipping such well in the field, and (ii) interest at 2y2 per cent per annum for five years on said cost of drilling and equipping such well, and (iii) ad valorem and gross production taxes applicable to the seven-eighths working interest in said well and its production, computed for a term of five years on the then prevailing ad valorem and gross production tax rates.
*589 The Chicago Corporation will cause all steps to be taken which may be necessary to perpetuate and keep in full force and effect all oil and gas leases now owned by The Corpus Christi Corporation in Jim Wells, Kleberg and Nueces Counties, Texas, and regardless of any other provision hereof, The Chicago Corporation will cause said leases to be protected from drainage and cause all expressed and implied lease covenants to be kept and performed.
10. The written offers made by Chicago were accepted by plaintiffs and other stockholders, and between May 5, 1941 ■and May 15, 1941, they transferred fro rata 2,750 shares of the capital stock of Corpus Christi to Chicago, thereby bringing its ownership to 4,000 shares, or 80 percent of the total outstanding stock, leaving the other stockholders owning 1,000 shares or 20 percent of the total outstanding stock.
11. In accordance with the contracts resulting from the written offers made by Chicago and the acceptances thereof by the other shareholders, Chicago caused Corpus Christi to give notice to its stockholders of a special meeting to be held on May 26, 1941, for the purpose of adopting or rejecting the plan for the complete liquidation of Corpus Christi. The notice stated that in the event the stockholders of Corpus Christi voted to adopt the complete plan of liquidation, each minority stockholder would receive, in complete cancellation and liquidation of the shares owned by him, the overriding royalty interests quoted in finding 8. The notice further stated that upon liquidation of Corpus •Christi the distribution to Chicago would be as follows:
2. Distribution to The Chicago Corporation. The Chicago Corporation shall receive in such complete liquidation and in complete cancellation and liquidation of the 4,000 shares of capital stock of The Corpus Christi Corporation owned by The Chicago Corporation, all assets of The Corpus Christi Corporation other than the interests proposed to be conveyed to the Minority Stockholders), subject to all liabilities of the corporation, and subject to the interests conveyed to the Minority Stockholders.
* * * * *
12. The meeting of the stockholders was held and the plan :for complete liquidation of Corpus Christi was adopted on May 26,1941. Corpus Christi was completely liquidated *590 on June 30,1941. Pursuant to the plan, Chicago thereafter took over the development and operation of the properties in accordance with the terms of the contracts resulting from the offers of May 5, 1941, and the acceptances thereof.
13. On May 26,1941, Corpus Christi executed conveyances-of the overriding royalty interests to each of the minority stockholders, including plaintiffs, pursuant to the plan of liquidation. Each of these documents was identical in terms-except for the name of the stockholder and the amount of the overriding royalty interest received by him. The conveyance to William K. Warren read in pertinent part as follows:
STATE OF TEXAS,
COUNTY OF NUECES.
KNOW ALL MEN BY THESE PRESENTS:
That the Corpus Christi Corporation, a Texas corporation, for and in consideration of the sum of Ten and no/100 ($10.00) Dollars, and other good and valuable considerations to it paid by W. K. Warren of Tulsa, Oklahoma, receipt of which is hereby acknowledged, has granted, sold, conveyed, and assigned, and by these presents does grant, sell, convey, and assign unto the said W. K. Warren, free and clear of all liens- and encumbrances whatsoever, the following overriding royalty interests, in and to the oil, gas, and mineral leases and leasehold estates covering lands situated in Nueces, Jim Wells, and Kleberg Counties, Texas, described in Exhibit “A” hereto attached, to-wit:
(a) .16 per cent of 8/8ths of all the oil, gas, and other minerals m and under and that may be produced and saved from the oil, gas, and mineral leases and leasehold estates described in said Exhibit “A” hereto attached, if, as and when so produced and saved from said premises.
(b) .16 per cent of 8/8ths of all products extracted and separated from gas produced from the oil, gas, and mineral leases and leasehold estates described in Exhibit “A” hereto attached, if, as and when extracted and separated.
The interests herein conveyed shall at all times be free and clear of all costs, charges and expenses of development, operation, and extraction; and Grantee shall have no interest in any personal property or well and plant equipment situated on said premises.
*591 With respect to the overriding royalty interest on oil produced from wells drilled on the property after May 20,1941,, the offer of May 5,1941, and the above-described instrument provided that the payment of such royalty would be temporarily deferred until recovery of the cost of the well from seven-eighths of the oil produced and that the payment, deferred would bear interest from the date it accrued until paid at the rate of 5 percent per annum. The conveyance further provided:
1
Grantor will perpetuate and keep in full force and' effect all of the oil and gas leases and leasehold estates-described in said Exhibit “A” hereto attached, and regardless of any other provisions hereof, Grantor will protect said leases from drainage and keep and perform all express and implied lease covenants therein com tained.
2
Grantor obligates itself, its successors and assigns,, for such period of time and from time to time as. Grantee may elect, to sell and market the petroleum products, or any of them, accruing to the interest herein conveyed in the same proportion as it makes sales of like-products of its own derived from said properties, and to deliver to Grantee his portion of the proceeds of sale,, on the basis of 100% tank tables on or before the 20th day of each calendar month; provided, however, that with the exception of overriding royalty deferred as herein provided, Grantee shall at all times have the right and option to take said petroleum products, or any of them, that accrue to the interests herein conveyed, in kind, and in the event Grantee elects to take said products or any of them in kind, Grantor shall provide Grantee with at least sixty (60) days’ suitable storage on said premises-for the said products accruing to the interests conveyed.
TO HAVE AND TO HOLD THE INTERESTS CONVEYED Unto Grantee, his heirs and assigns forever, and Grantor hereby binds itself, its successors and assigns, to warrant and forever defend all and singular the said premises- and rights conveyed by this instrument unto Grantee,, his heirs and assigns, against every person whomsoever lawfully claiming, or to claim the same, or any part thereof.
This assignment shall become effective as of the 1st day of May, 1941, at Y: 00 A. M.
*592 IN witness wheeeof, The Corpus Christi Corporation has caused this conveyance to be executed by its President, attested by its Secretary, and its corporate seal affixed, this 26th day of May, 1941, all in accordance with resolutions duly adopted by the stockholders and directors of said corporation.
14. The overriding royalty interests conveyed to plaintiffs and the other minority stockholders were as follows:
Royalty owner Shares of stock Overriding owned on royalty date of (percent liquidation of 8f8)
W. K. Warren_ $8. 53 $0. 16
W. K. Warren, Trustee for:
Dorothy A. Warren-26. 67 . 5
Natalie Warren_ 26. 67 . 5
Marilyn C. Warren_ 26. 67 . 5
Patricia Ann Warren_ 26. 67 . 5
Elizabeth K. Warren-26. 67 . 5
Jean Marie Warren_ 26. 67 . 5
William K. Warren, Jr__. 26. 66 . 5
Natalie O. Warren_ 40. 00 . 75
J. A. LaFortune_ 2. 93 . 055
J. A. LaFortune, Trustee for:
Jeanne G. LaFortune_ 26. 67 . 5
Mary Ann LaFortune_ 26. 67 . 5
Joseph A. LaFortune, Jr. 26. 67 . 5
Robert J. LaFortune_ 26. 66 . 5
H. E. Felt__ .53 .01
H. E. Felt, Trustee for:
Jean Felt_ 9. 87 . 185
Joan Felt_ 9. 87 . 185
Janet Felt_ 9. 86 . 185
Mabel H. Felt_ 9. 06 . 17
H. E. Felt, Trustee for:
E. E. DeBack_ 20. 00 . 375
E. E. DeBack_ 6. 66 . 125
Sara Jane Quinn_ 8. 00 . 15
S. N. Van Wert_ 65. 33 1. 225
Irene Sheerin_ 258. 00 4. 837
Creslenn Corporation_ 66. 67 1. 25
Clyde H. Alexander_ 84. 67 1. 588
Crestón H. Alexander_ 26. 67 . 5
Glenn E. Alexander_ 26. 67 . 5
Helen Mae Alexander Dimit_. 26. 67 . 5
Euna M. Alexander_ 26. 67 . 5
Total_ 1, 000. 00 18. 75
*593 15. The conveyances of the overriding royalty interests to plaintiffs and the other stockholders were recorded in the Eeal Estate Eecords of the offices of the County Clerks in Jim Wells, Kleberg, and Nueces Counties, Texas. These documents were similar in terms to instruments generally used in the gas and oil industry conveying overriding royalties with the exception of the provision relating to the deferment of the payment of the overriding royalty in oil produced from new wells drilled after May 20, 1941, pending recovery of the cost of the wells. The conveyances provided that a separate account would be kept for each new oil well and that statements as to the cost of the well and monthly statements of the proceeds of all overriding royalties accrued and deferred on each well would be furnished to the grantees. On the basis of the production from the oil wells drilled prior to May 20,1941, it appeared that it would take approximately four years for each new well to pay out its costs and to reimburse the royalty owners for their deferred royalties.
16. On May 26, 1941, Corpus Christi conveyed to each of the minority stockholders the oil payment rights in the sum of $150 per share, which are described in paragraph (b) of the quoted material set out in finding 8. Such oil payment rights are not in issue in these cases.
17. Each of Chicago’s written offers of May 5, 1941, and each of the conveyances of the overriding royalties to plaintiffs provided in substance that Corpus Christi was obligated to sell and market the petroleum products accruing to the interest conveyed to plaintiffs in the same proportion as it made sales of like products of its own from the same properties and gave plaintiffs the option to have Corpus Christi pay them the proceeds of sales on or before the 20th day of each calendar month or to take the products in kind, in which event Corpus Christi agreed to provide at least 60 days’ suitable storage for all products accruing to the plaintiffs.
In the oil and gas industry, it is not customary for the owners of overriding royalties to accept the products produced in kind, except in a few instances where a royalty owner desires to obtain road oil or something of the kind. Each of the plaintiffs elected to require Corpus Christi to sell the petroleum products accruing to his interest and give *594 credit and pay all the proceeds to him. Such election was made by the execution of a division order addressed to Corpus Christi, effective May 1, 1941. Each of the division orders was similar to the division orders addressed to Chicago after the liquidation of Corpus Christi, except that the division orders to Corpus Christi did not contain a provision comparable to paragraph 6 of the division orders addressed to Chicago and quoted in the next finding.
Between May 1, 1941 and June 30, 1941, Corpus Christi sold petroleum products under the division orders given to it and paid the proceeds to plaintiffs and the other minority stockholders in the amount of $22,570.61.
18. After the liquidation of Corpus Christi and on or about October 24, 1941, plaintiffs each executed division orders addressed to Chicago. The division order executed by plaintiff, William K. Warren, which is typical of division orders signed by the other plaintiffs, provided in pertinent part as follows:
To the Chicago CorporatioN,

Corpus Christi Division.

1. The undersigned certifies and guarantees that he is the legal owner of and hereby warrants the title to his respective interests as set out below in all oil and gas (including products of gas) produced from all wells on the Wardner leases situated in Nueces, Jim Wells and Kleberg Counties, Texas, comprising a total of 8782.39 acres, which may be hereinafter referred to as Royalty Units One, Two, Three, Four and Five, all of which are more particularly described in Exhibit “A” attached hereto ana made a part hereof, and until further written notice is received by you from the undersigned, you are hereby authorized to receive and sell all oil, gas and the products of gas including natural gasoline, condensate and other products and to give credit for and pay over my interest in the proceeds as directed below.
Division of interest
Royalty owner (percent of 8/8)
W.K. WaeeeN,

P. 0. Box 1589, Tulsa,, Ohlahoma.

Overriding royalty-- 16
*595 4. On or before the 20th day of each month, The Chicago Corporation will make payment to the undersigned for his respective interest as shown above, in all oil produced, saved and sold from wells drilled on said lands prior to May 20th, 1941, after deducting the proportionate share of taxes. At the same time, The Chicago Corporation will also make payment to the undersigned for his respective interest in all gas sold from any well on said land, and in addition thereto for his respective interest in all products separated or extracted from all gas, produced from any well on said land, which are saved and sold by The Chicago Corporation, after deducting the necessary transportation charges and the proportionate share of taxes. Payment shall be made by check or draft mailed or delivered to the undersigned on or before the 20th day of each month for all such oil, gas, and products produced, saved and sold during the preceding month.
5. On or before the 20th day of each month, The Chicago Corporation shall enter upon its books a credit in favor of the undersigned for his respective interest as shown above in all oil produced, saved and sold from wells drilled on said lands after May 20th, 1941, and shall mail or deliver to the undersigned a statement showing the interest of the undersigned in oil produced and sold from said wells during the preceding month, it being understood that the money evidenced by the accumulated credits will be disposed of in accordance with the terms of the conveyance first above mentioned.
6. This instrument evidences the intention of the undersigned to look only to The Chicago Corporation for the payment of his respective interest in the proceeds of the sale of the substances mentioned herein, and all purchasers of same are hereby relieved of any duty or obligation in respect thereto. All sales by The Chicago Corporation of the respective interest of undersigned in said substances shall be at the same price and on the same terms as the sale of said Corporation’s own interest therein, provided oil shall not be sold for less than the price posted by the purchaser for oil of the same gravity, kind and quality in the same field on the day such oil is sold.
Pursuant to such orders, Chicago sold the petroleum products and remitted the portion of the proceeds due plaintiffs to them once each month. As a result of the execution of the division orders, plaintiffs looked to Chicago for the payments to them of the amounts due on their overriding royalty in- *596 fcerests. From July 1, 1941 to the end of 1956, Chicago marketed the products and remitted to the plaintiffs and the other minority stockholders the portions due them under their overriding royalty interests, which amounted in total to the sum of $11,548,107.84.
Plaintiffs had no facilities for marketing the petroleum products accruing to their overriding royalty interests. If they had elected to take the products in kind, Chicago would have been obligated to store them for a period of 60 days, but thereafter plaintiffs would have had to provide their own storage and in all instances to arrange for the sale of the products. Had plaintiffs elected to take the products in kind, they would have received payments directly from the purchasers rather than from Corpus Christi or Chicago. Where there are a large number of overriding royalty owners, it is a convenient arrangement for the purchaser of the products to deal with the operator of the oil and gas leases who in turn pays the overriding royalty to the owners thereof. The sale and marketing of the products accruing to plaintiffs’ interests were handled in a manner normally followed by the oil and gas industry.
19. After the liquidation of Corpus Christi, Chicago enlarged and redesigned the recycling plant acquired in the transaction. It also proceeded to drill the 60 additional wells and to carry out the other terms and provisions of the contracts resulting from the acceptance of Chicago’s offers of May 5,1941. Since Chicago began the development and operation of the properties formerly belonging to Corpus Christi, it has marketed and sold the products produced from the Wardner properties and made payments to the plaintiffs for the proceeds accruing to their overriding royalty interests.
20. Prior to May 5, 1941, Chicago was primarily an investment concern. After it acquired the oil and gas properties which had been owned by Corpus Christi and other properties acquired from the liquidation of other corporations, it became extensively engaged in the exploration and production of oil and natural gas and the extraction of liquid hydrocarbons from natural gas. In 1941, the stock of Chicago was publicly held and was listed on the Chicago Stock Exchange. In 1946 the stock became listed on the New York *597 Stock Exchange and is so listed at the present. During all of the years pertinent to this action and for many years prior thereto, the stock of Chicago was widely held.
21. In its income tax return for 1941, Chicago took the position that it received the assets of Corpus Christi in a nontaxable transaction, as provided in Section 112 (b) (6) of the Internal Eevenue Code of 1939. The Internal Eev-enue Service ruled that the liquidation of Corpus Christi was contemplated by Chicago on May 5,1941, when it offered to purchase sufficient stock from the other stockholders to obtain a controlling interest, and that the liquidation did not come within Section 112 (b) (6) of the Internal Eevenue Code, because that section requires that the recipient corporation must have been the owner of the specified amount of such stock on the date of the adoption of the plan of liquidation. As a result of this ruling, Chicago was taxed at capital gain rates on the gain from the liquidation of Corpus Christi. The gain was measured by the difference between its basis for the stock it owned and the fair market value of the assets it received on liquidation of Corpus Christi.
22. At the time their stock was sold to Chicago, plaintiffs had held it for more than two years. In their 1941 returns, they reported the cash received for the stock less the cost basis thereof as capital gain. In their returns for the same year, they reported as ordinary income the overriding royalty income paid to them by Chicago and deducted percentage depletion of 27% percent. They did not report the fair market value of the overriding royalty interests received in liquidation of Corpus Christi as capital gain, because they stated that such royalty interests had no ascertainable fair market value.
On examination of the returns and on the basis of a report made by an engineer revenue agent on July 20, 1942, the Bureau of Internal Eevenue determined deficiencies and taxed plaintiffs at capital gain rates on the difference between the basis for the stock cancelled in liquidation of Corpus Christi and the sum of $1,035,000, which the Bureau determined to be the fair market value of the overriding royalty interests of all the minority stockholders.
*598 23. For the taxable years involved in this suit (1949 through 1952), the plaintiffs, following certain rulings of the Bureau of Internal Bevenue, included in their income tax returns as ordinary income the overriding royalties paid to them by Chicago, being the proceeds of the petroleum products sold on their behalf pursuant to the division orders, less a percentage depletion deduction of 27% percent.
24. After filing the returns each of the plaintiffs filed claims for refunds for the years 1949 through 1952 inclusive, in the total amount of $199,634.17 on the ground that the amounts received by plaintiffs from Chicago and reported by them as ordinary income should have been taxed at capital gain rates rather than at ordinary income rates. All the claims of refund were either rejected by the Commissioner of Internal Bevenue or were filed more than six months prior to the institution of these suits.
25. In his report of July 20, 1942, the engineer revenue agent fixed the market values of the overriding royalty interests of the minority stockholders as of June 30, 1941, as follows:
Oil and gas overriding royalty interests_$45,000
Distillate overriding royalty interests_ 495, 000
Plant income overriding royalty interests_ 495,000
Total- 1, 035, 000
In making his valuation he had access to Herring’s reports of February 1,1939, and Brown’s report of January 9,1941. His valuation was based entirely on part of the data set forth in Brown’s report, because the agent stated that Brown used only proven acreage in making his estimates. His value for the overriding royalty interests in oil was based entirely on the gross income in 1941 from the four oil wells which were then producing. The gross income from the four wells was approximately $5,000 per month and by using the 4-year payout method, he concluded that the value of the oil royalty was $45,000 (48 months x $5,000 per month x 18.75 percent equals $45,000).
For the value of the overriding royalty interests of the products extracted and separated from the oil and gas, the engineer revenue agent arrived at a value of $990,000; this *599 was his valuation for the distillate to be extracted from the gas. He took Brown’s estimate of 9,500,389 barrels of recoverable condensate, reduced it to the round figure of 9,500,000 barrels, and used Brown’s estimated price of $1.30 per barrel. He also assumed that the plant expansion proposed in the Brown report would be made. Since the report of the engineer revenue agent was made July 20, 1942, he was aware of the fact that the changes in and additions to the recycling plant had actually been completed in January 1942. Pie computed the value by using the reserve method and the payout method. Under the reserve method, he used Hoskold’s formula, a 7-year life and a 10 percent discount for determining the present value of the anticipated income. He then discounted the anticipated income 25 percent for profit and hazard. A present worth of $979,598.04 was obtained for the 18.75 percent distillate royalty of plaintiffs and the other minority stockholders.
By the payout method he arrived at a value of $990,000 for the overriding distillate royalty as follows:
Gross sales per month distillate (new plant)_ $110, 000
Gross sales per year distillate (new plant)_ 1,320, 000
Yearly income to the 18.75 percent interest_ 247, 500
Present worth of 18.75 percent interest (4-year
payout)_ 990,000
As stated above, the engineer revenue agent’s value for the oil royalty was based entirely on the gross income from the four wells in production in 1941. He did not give any consideration to or allow any value for the oil that might be produced from additional wells to be drilled in the future, although he knew that Brown had recommended the drilling of 58 additional oil wells on the property and that Chicago was obligated under its contracts with the minority stockholders to drill 60 additional wells, subject to the conditions set forth in finding 9. In Brown’s report, the estimated net return to the operator, before Federal income and capital stock taxes, on each oil well to be drilled was $8,800 per annum.
The engineer revenue agent did not allow any value for the overriding royalty interests on the unproven acreage, *600 because Brown’s report was based on what he considered to be proven acreage.
As already stated, at the time Corpus Christi was liquidated, there was production on two producing sands and two others had been tested. Brown’s estimate of the recoverable condensate was based on the yield from these four sands and from an additional four sands which were nonproducing at the time. The engineer revenue agent’s valuation did not take into account any production that might be realized from any other producing sands in the future.
In valuing the overriding royalty interests on the products extracted from gas produced from the properties, the engineer revenue agent’s value was limited to the distillate, although he knew that the overriding royalty covered other liquid hydrocarbons such as butanes and propanes, and that in May of 1941, it was proposed that the recycling plant would be enlarged to permit recovery of butane and propane. In the Brown report, which contemplated the recovery of a large percentage of butanes and practically all the pentanes and heavier constituents of gas, Corpus Christi’s net return from the recycling plant was estimated at $1,105,168 per year or $7,504,056 for the assumed 7-year life of the known gas reserves.
26. The substantial amount of income which the plaintiffs and other minority stockholders have received from their overriding royalty interests has been due to a number of factors, including the following:
(a) At the time Corpus Christi was liquidated, production was limited to two sands, although two other sands had been tested. At the present time, there is a total of 17 producing sands. In 1941, production was confined to approximately 2,200 acres of the 8,800-acre tract, but since that time Chicago has proceeded with the development of the properties in accordance with the contracts of May 5, 1941;
(b) at the time plaintiffs acquired their interests, only four oil wells had been drilled on the property, and while the evidence does not show the total number of oil wells that have been drilled since that date, six additional oil wells had been drilled by October 28, 1941. In addition, the price of *601 oil was frozen during tbe war years, but it started rising in 1946, and at one time reached a price of $2 per barrel;
(c) the Tennessee Gas Transmission Company constructed a pipeline in the area, thereby providing a market for the dry gas where none existed before. In 1941, the price of gas was about 2 cents per 1,000 cubic feet, but it has since increased to as much as from 10 to 15 cents per 1,000 cubic feet;
(d) big markets have been found for bottled butane and propane gas, the extraction of which was made possible through the addition to the recycling plant, and
(e) chemical companies have greatly increased their use of petroleum products.
27. With respect to the nature of the interests acquired by the plaintiffs in the conveyances of the overriding royalties to them (finding 13), notice is taken of the decisions of the courts of Texas that the estate acquired by the lessee, or his assigns, in an oil and gas lease is a determinable fee in the oil and gas in place (W. T. Waggoner Estate v. Sigler Oil Co., 19 S. W. 2d 27); that in an assignment or conveyance of an overriding royalty, the assignee or grantee acquires a fractional part of the lessee’s original working interest in the lease (Rogers Nat. Bank of Jefferson v. Pewitt, 231 S. W. 2d 487), and that an oil and gas royalty, whether created by grant, reservation or lease, is an interest in land (Sheffield v. Hogg, 77 S. W. 2d 1021). Notice is also taken of the decision of the Supreme Court in Palmer v. Bender, 287 U. S. 551, that when the lessee of oil and gas leases discovered oil on the land and transferred to another the right to take over the part of the leased property on which the producing well was located in consideration of a cash bonus, a future oil payment, and a royalty of one-eighth of the oil produced and saved from the land, the lessee thereby retained an economic interest in the oil in place.
28. In the oil and gas industry, it is frequently necessary to make valuations of oil and gas interests, including overriding royalties. In some instances, banks and insurance companies make loans for which overriding royalties are pledged as collateral. The banks that make such loans are usually large banks which employ their own engineering *602 staffs or on occasion engage other engineers to value the property. There are two companies in Texas which invest in overriding royalties. Valuations of oil and gas royalties are also required from time to time in order to make an equitable distribution of property in divorce proceedings, in the liquidation of corporations, and in suits involving the partitioning of property. Valuations of such royalties are also needed for various tax purposes. There is always some trading in royalties in the case of completely developed properties, but royalties are also sold on properties which have only been partially developed.
29. There were no sales of the overriding royalties conveyed to plaintiffs or the other minority stockholders, and there is no evidence of any sales of comparable interests in similar oil and gas properties at or about the time pertinent to these suits.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover and their petitions are therefore dismissed.